102 F.3d 1012
 96 Cal. Daily Op. Serv. 9203, 97 Cal. Daily
Op. Serv. 1350,
96 Daily Journal D.A.R. 15,215,
97 Daily Journal D.A.R. 2025
James Senator MARKS; Tommy Marks; David Marks, Plaintiffs-Appellees,
v.
John R. CLARKE; William F. Grub; Stephen W. Keane;
Michael Lavelle; Gerald R. Poindexter; Robert
VanLeuven; Ralph C. Weir, Defendants-Appellants,
James Senator MARKS; Tommy Marks; David Marks, Gypsy
Church of the Northwest, Plaintiffs-Appellees,
v.
John R. CLARKE; William F. Grub; Stephen W. Keane;
Michael Lavelle; Gerald R. Poindexter; Robert
VanLeuven; Ralph C. Weir, Defendants,
and
Robert G. Bailor; Denise E. Coker; Monte E. Gaunt; Donald
E. Johnson; Richard J. Poole; Nicolis E.
Stanley; Michael F. Yates,
Defendants-Appellants.
James Senator MARKS; Tommy Marks; David Marks, Plaintiffs-Appellees,
v.
John R. CLARKE; William F. Grub; Stephen W. Keane;
Michael Lavelle; Gerald R. Poindexter; Robert
VanLeuven; Ralph C. Weir, Defendants,
and
City of Spokane; Robert Allen; Earl L. Ennis; Lawrence R.
Freeman; Clifford Harding; Kenneth R. Krogh; Larry M.
Lindskog; Jack E. Neumiller; Andrew J. Pavlischak;
Sheldon Reeve, Defendants-Appellants.
GYPSY CHURCH OF THE NORTHWEST, Plaintiff-Appellee,
v.
SPOKANE COUNTY, Defendant,
and
John R. Clarke; William F. Grub; Stephen W. Keane;
Michael Lavelle; Gerald R. Poindexter; Robert
VanLeuven; Ralph C. Weir,
Defendants-Appellants.
GYPSY CHURCH OF THE NORTHWEST, Plaintiff-Appellee,
v.
SPOKANE COUNTY, Defendant,
and
Robert G. Bailor; Denise E. Coker; Monte E. Gaunt; Donald
E. Johnson; Richard J. Poole; Nicolis E.
Stanley; Michael F. Yates,
Defendants-Appellants.
GYPSY CHURCH OF THE NORTHWEST, Plaintiff-Appellee,
v.
SPOKANE COUNTY, Defendant,
and
City of Spokane; Robert Allen; Earl L. Ennis; Lawrence R.
Freeman; Clifford Harding; Kenneth R. Krogh; Larry M.
Lindskog; Jack E. Neumiller; Andrew J. Pavlischak;
Sheldon Reeve, Defendants-Appellants.
GYPSY CHURCH OF THE NORTHWEST, Plaintiff-Appellee,
and
Grover Marks, Plaintiff-Appellee,
v.
Detective Rick GRABENSTEIN, Defendant-Appellant.
 Nos. 93-36092 to 93-36094, 94-35251 to 94-35253 and 94-35372.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 16, 1995.
Decided Dec. 19, 1996.
As Amended on Denial of Rehearing Feb. 26, 1997.
 
 Rocco N. Treppiedi and Jeanie J. Mohler, Assistant City Attorneys, Spokane, WA, Jerry R. Neal and John R. Nelson, Preston Gates & Ellis, Spokane, WA, for defendants-appellants.
 Gregg R. Smith, Spokane, WA, Terry E. Thomson, Sternberg, Thomson & Okrent, Seattle, WA, and Patrick K. Stiley, Spokane, WA, for plaintiffs-appellees.
 Appeals from the United States District Court for the Eastern District of Washington, Alan A. McDonald, District Judge, Presiding. D.C. Nos. CV-89-00423-AAM, CV-89-00425-AAM.
 Before: REINHARDT, TROTT and TASHIMA,* Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Appellants in this case are twenty-three individual City of Spokane police officers[1] and one individual Spokane County law enforcement officer.[2] Appellees, the plaintiff Gypsy Church of the Northwest and the twenty-six individual plaintiffs in district court cases Marks v. City of Spokane and Gypsy Church v. Spokane County, filed suit under 42 U.S.C. § 1983 in June 1989 alleging that three years earlier, in 1986, appellants and the City of Spokane and Spokane County (the "municipalities")[3] violated their Fourth Amendment rights by unreasonably seeking and unreasonably executing a warrant to search two residences and all the persons present at those residences. On this appeal, appellants challenge four orders of the district court in which that court initially denied all but two of the appellants qualified immunity, certified the interlocutory appeal of its qualified immunity determination as "frivolous" and retained jurisdiction over the proceedings, denied the remaining two appellants qualified immunity and granted partial summary judgment in favor of the plaintiffs. At that point it deemed the qualified immunity appeals no longer frivolous.
 
 
 2
 Appellants filed their first motions for summary judgment on the basis of qualified immunity in early 1990. District Judge Robert J. McNichols denied the motions on May 30, 1990 because material disputes of fact existed regarding their conduct during the search. In September 1991, Judge McNichols held that the issue whether the search was legal had been fully litigated and resolved, in state criminal proceedings, against both the individual officers and the municipalities and that they were all collaterally estopped from relitigating the search's legality in the present civil action. Later in September 1991, defendants requested the district court to reconsider its order regarding the applicability of collateral estoppel, and Judge McNichols denied the motion. In February 1992, plaintiffs moved for summary judgment, and defendants, in turn, again moved for reconsideration of the collateral estoppel issue. In a March 1992 order, Judge McNichols denied the plaintiffs' motion for summary judgment on the ground that "key issues of vigorously disputed fact" existed and again declined to reconsider its collateral estoppel order.[4] The disputed issues of fact apparently related to questions of which of the individual officers did which acts to which plaintiffs and at what times.
 
 
 3
 Judge McNichols died before any further significant court proceedings occurred, and the case was reassigned to District Judge Alan A. McDonald. Defendants thereupon moved a third time for reconsideration of Judge McNichols' collateral estoppel determination, and the plaintiffs moved for reconsideration of the denial of their summary judgment motion. On October 21, 1993, Judge McDonald reversed Judge McNichols' collateral estoppel order as it applied to appellants[5] and, because appellants were no longer estopped from arguing that the search was lawful, granted the plaintiffs leave to revise and resubmit their summary judgment motion regarding the liability of the individual officers. In the same order, Judge McDonald denied qualified immunity to all of the individual City officers except Reeve and postponed ruling on the qualified immunity of Reeve and County officer Grabenstein until he ruled on the renewed motion for summary judgment that he expected the plaintiffs to file.[6] The individual City appellants, including Reeve, filed notices of appeal from this order. Reeve appealed the court's failure to rule on his qualified immunity motion,[7] while the other City officers appealed the court's denial of their qualified immunity motions on the merits. Grabenstein did not appeal the October 21, 1993 order until later.
 
 
 4
 After filing their notice of appeal from Judge McDonald's qualified immunity order, the City appellants filed a motion in the district court to stay the trial set for March 7, 1994 and all other proceedings in the case pending resolution of their interlocutory appeal of the qualified immunity determination. On November 24, 1993, the district court certified their interlocutory appeal as "frivolous," retained jurisdiction as we have allowed under Chuman v. Wright, 960 F.2d 104, 105 (9th Cir.1992), and, accordingly, denied their motion for a stay. Appellants did not seek a stay from this court.
 
 
 5
 On January 21, 1994, Judge McDonald ruled that Grabenstein and Reeve were entitled to immunity for seeking the warrant to search but denied them immunity for conduct related to the actual search and, in light of his retention of jurisdiction under Chuman, granted the plaintiffs summary judgment on liability as to the search itself, holding that it was conducted pursuant to an invalid warrant. At the same time, the judge reserved certain specific questions as to specific conduct by particular plaintiffs and defendants for trial. The City appellants then filed an amended notice of appeal, appealing the denial of their motion for a stay of proceedings and the summary judgment order. In addition, Reeve's appeal encompassed the denial of his qualified immunity motion. Grabenstein appealed the court's October 21, 1993 failure to grant him qualified immunity in accordance with an extension of time for that purpose granted him earlier by the district court.
 
 
 6
 Finally, on March 7, 1994, the district court ruled on motions for reconsideration filed by both sides. In this order, Judge McDonald denied Grabenstein and Reeve's request for reconsideration of his denial of qualified immunity to them. He also clarified some of his liability rulings. The City officers filed second amended notices of appeal from Judge McDonald's ruling on the motions for reconsideration and Grabenstein filed another notice of appeal, appealing the district judge's January 21, 1993 order denying his motion for qualified immunity and granting the plaintiffs summary judgment on liability. Grabenstein's notice of appeal was also from Judge McDonald's order deciding the motions for reconsideration.
 
 
 7
 We review only three of the four orders appellants ask us to review. The district court's November 24, 1993, order certifying appellants' interlocutory appeal as frivolous and refusing the appellants' request for a stay of further proceedings is not appealable.[8] After applying to the district court for a stay, the City appellants should have applied to this court for a discretionary stay to prevent the district court from proceeding to trial. See Chuman, 960 F.2d at 105 n. 1. They failed to do so. We note, however, that the damage to the appellants was limited, because after entering its summary judgment order as to liability and ruling on Grabenstein and Reeve's entitlement to qualified immunity, the district court then certified the City appellants' interlocutory appeal as no longer frivolous and stayed the trial. The three orders we review include among their holdings the denials of appellants' qualified immunity motions in the October 21, 1993, January 21, 1994, and March 7, 1994 orders.[9] See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817-18, 86 L.Ed.2d 411 (1985). This case is quite unusual. Ordinarily, if the district court deems the appeal frivolous and the court of appeals agrees, the appeal can be disposed of summarily. When however, the court of appeals concludes that the appeal has some substance, it will ordinarily grant the stay and handle the appeal in the ordinary course. Then, only the rulings made prior to the appeal are potential candidates for review. In the instant case, we consider a non-frivolous interlocutory appeal in the normal course, except that because there was no stay, the district court proceeded to make substantial rulings on the case while the appeal was pending. Thus, here included in the three orders, are additional significant rulings that we are now asked to review.
 
 
 8
 We conclude that in this case we have jurisdiction to review the district court's rulings granting partial summary judgment on liability,[10] even though those rulings are not independently immediately appealable.[11] We do so because the district court's liability rulings are unquestionably inextricably intertwined with its decisions to deny appellants qualified immunity. See Swint v. Chambers County Comm'n, 514 U.S. 35, ----, 115 S.Ct. 1203, 1212, 131 L.Ed.2d 60 (1995). In reviewing the district court's orders, it is often impossible to separate the court's reasoning or decisions regarding qualified immunity from those regarding liability. The issues are generally analyzed together and are sometimes simply not susceptible of independent review. Equally if not more important, the district court's rulings granting partial summary judgment in favor of the plaintiffs on the issue of liability are dependent on both the reasoning and results of its qualified immunity decisions: a predicate to granting summary judgment in favor of the plaintiffs on the liability issue is the conclusion that appellants are not entitled to qualified immunity. Accordingly, insofar as we reverse the qualified immunity determinations of the district court, our decision also necessarily requires reversal of the consequent liability rulings. To conclude otherwise would result in the anomaly of a conflict between our qualified immunity holdings and the liability determinations of the district court. Thus, to the extent that we hold that appellants are entitled to qualified immunity or that a triable issue regarding qualified immunity exists, we reverse any inconsistent summary judgment decision contained in the district court's January 21, 1994 and March 7, 1994 orders.
 
 I. BACKGROUND
 
 9
 The factual and procedural history of the civil cases relating to this ten year-old search is quite extensive. We set forth below an overview of the most relevant aspects of the events which led up to the civil filings, and of the numerous judicial proceedings, criminal and civil, that have stemmed from those events.A. Factual Background
 
 
 10
 In the late spring of 1986, Spokane County Sheriff Detective Rick Grabenstein arrested Michael White in connection with a string of burglaries in Spokane County. White informed Grabenstein that he had sold items of stolen property to James "Sonny" Marks at a residence located at 802 S. Thor and at other unidentified locations, and to other "gypsies," including Grover Marks, at A & A Auto Sales and another residence located at 428 S. Thor.[12] Because the three locations were within the Spokane city limits, Grabenstein contacted the Spokane City Police Department Burglary Task Force, a task force composed of several burglary detectives, plainclothes officers from the patrol division, and a sergeant, under the direction of Lieutenant Larry Freeman. Grabenstein was temporarily assigned to the Task Force to facilitate the investigation.
 
 
 11
 At the Task Force's request, White attempted to sell purportedly stolen property at 802 S. Thor and 428 S. Thor while the police observed his efforts. White successfully conducted the first such sale on June 10 to James Marks at 802 S. Thor. The investigating officers, including defendants Grabenstein, Reeve, and Neumiller, obtained court authorization to videotape and audio record subsequent conversations between White and individuals at the sale locations. Ensuing successful sales were videotaped on June 12 and June 17. On June 18 at 802 S. Thor, the officers, again using White, attempted another undercover sale. Because of the way the person who answered the door behaved, the officers concluded that she was aware of their surveillance. The investigating officers returned to the police station and informed defendants Freeman and Allen that they believed the investigation had been detected, and thereby compromised, and that they wanted to secure a warrant to search the two Thor residences.
 
 
 12
 Allen, a captain in charge of the Spokane City Police Department's Investigative Division, authorized the detectives to end the investigation and obtain a search warrant forthwith. Allen also authorized the use of detectives from other units to assist in the search operation and recruited additional personnel from other divisions in the department.
 
 
 13
 Three officers, Grabenstein, Reeve, and Neumiller, prepared the affidavit in support of the warrant. Neumiller collected the reports of the seventeen burglaries to which informant White had confessed and reviewed them with Grabenstein and Reeve. However, he left during the preparation of the warrant application to participate in a noon briefing of officers who were to assist in the search.
 
 
 14
 In their affidavit, the officers requested a warrant[13] to search 428 S. Thor and 802 S. Thor, all vehicles on those premises, and James Marks, Grover Marks, and any other persons present "for officer safety." The magistrate signed the proposed warrant submitted by the officers at approximately 3:10 p.m. Unlike the request set forth in the affidavit, the warrant authorized searches of all persons on the premises for the purpose of obtaining evidence. Sixteen stolen property reports from White's burglaries and a list of the items White had sold at the Thor residences during the undercover investigation were apparently attached to the affidavit and the warrant.
 
 
 15
 The officers who conducted the search had varying degrees of information about the scope of the warrant. Grabenstein and Reeve, who had drafted the warrant and sought magistrate approval, saw the completed, signed warrant before they conducted any search activity. Defendants Clarke, Coker, Ennis, Gaunt, Johnson, Keane, Poindexter, and VanLeuven attended a briefing session at which defendants Allen, Freeman, Neumiller and Pavlischak told them about the types of items to be sought under the warrant they expected would be issued--items commonly stolen in residential burglaries, such as jewelry, silverware, electronic equipment and photograpic equipment. The officers who attended the briefing were informed that Grabenstein and Neumiller would be the case managers at the two residences and would each have a copy of the warrant. Other defendants, Bailor, Grub, Krogh, Lavelle, Poole, Stanley, and Yates, received less formal briefing in the form of instructions from other officers. Some of these defendants had participated in the investigation of the alleged fencing operation. Defendant Harding, the Assistant Chief of Police of the Spokane City Police Department, was apprised of some part of the events of June 18th.
 
 
 16
 Grover Marks lives at 428 S. Thor and James Marks, Grover's son, lives at 802 S. Thor. The numerous individuals present at 428 S. Thor and 802 S. Thor during the execution of the warrant were all related to Grover Marks and his wife, Marie Marks--they included their children, grandchildren, and one great-grandchild. Not all the individuals present, however, resided at the two residences.
 
 
 17
 All the plaintiffs are members of the Kalderasha tribe of Rom, or "Gypsies." Plaintiffs assert that at the time of the search and for a number of years preceding it, Grover Marks was the "baro" or "king" of his Rom community. As such, he assumed important political, cultural, and religious responsibilities. Grover Marks also contends that he served as a "private banker" responsible for safeguarding jewelry and other property of the community and its individual members throughout the northwestern United States. According to the plaintiffs, the baro of the Rom is also responsible for arranging payment for and hosting religious feasts and the weddings and funerals of community members.
 
 
 18
 Some officers were assigned to watch the Thor residences while others were assigned to the preparation of the warrant application and to obtaining the warrant. Officers began arriving at "the staging area," which was somewhere near the two residences, to await the receipt of the warrant approximately two hours before it was signed by the magistrate. At least an hour before the warrant was signed, defendant Weir stopped a vehicle leaving 428 S. Thor that was driven by plaintiff David Marks for a moving-traffic violation. Plaintiffs Jane Marks, Laura Zeko, and Chrissie Zeko were passengers in the vehicle. While Weir was speaking with David Marks, defendant Grub arrived and directed the individuals in the car to return to the house and wait for the search warrant. The driver and three passengers returned to 428 S. Thor and entered the residence. Around the same time, defendant Bailor stopped plaintiff James Marks, who was observed putting a container in the trunk of his car, as he was driving away from 802 S. Thor. The ostensible reason for the stops was the absence of a license plate.[14] Defendant Bailor, along with defendant Lindskog, conversed with James Marks and searched his vehicle with his consent, after which Marks, perhaps as requested, returned to his residence at 802 S. Thor.
 
 
 19
 The plaintiffs contend that officers VanLeuven, Keane, and Poindexter forcibly entered 428 S. Thor; appellants contend that Marie Marks invited the officers inside. Appellants also contend that James Marks invited Neumiller and other officers to enter 802 S. Thor and consented to a search of his home, informing the officers that a warrant was not necessary.[15] Plaintiffs do not offer evidence to refute the contention that James Marks initially consented to a warrantless search of his home;[16] however, the record supports the inference that, at some point during the course of these events, Marks withdrew his initial invitation and consent.[17] The plaintiffs assert that the search began hours before the warrant was even issued and was therefore invalid.[18] Appellants contend that the search did not commence until after copies of the search warrant were delivered to 802 S. Thor by Reeve and to 428 S. Thor by Grabenstein.[19]
 
 
 20
 The individual defendants were involved in the search operation in varying degrees. For instance, defendant Weir's only participation was his traffic stop of the vehicle driven by David Marks. Defendant Clarke evidently never entered either house and simply provided perimeter security. Defendant Lavelle videotaped the searches at both residences but did no searching himself. Other officers may have gone inside the homes but did not participate directly in any search or actual seizure. Some officers may have searched persons as well as the premises, while others may have performed only the latter type of search. Also, some of the defendants managed or supervised the search. Grabenstein and Neumiller served as the "case managers" in charge of the search at 428 S. Thor and 802 S. Thor, respectively. Freeman, who was back at the police station oversaw the search from there; officers at the search scene informed him of developments as they unfolded. Freeman monitored the search closely and periodically phoned defendant Allen and shared the information with him.[20]
 
 
 21
 Plaintiffs Grover and Marie Marks, their daughter Marguerite Marks and her child Steve Marks (23 months), their son Robert Marks and his children Richard (11 years) and Steven Marks (10 years), their daughter Laura Zeko and her four children Robert (11 years), Jason (9 years), Chrissie (6 years), and Sonny Zeko (7 months), their son Peter Marks and his son Buck Marks (6 years), and their daughter-in-law Jane Marks and her son David Marks were present during the search of 428 S. Thor. Plaintiffs James Marks and his son Michael Marks were present during most of the search of 802 S. Thor, but left to visit 428 S. Thor while the search of the latter residence was still in progress, and may have been searched there. Plaintiffs Larry Zeko (husband of Laura Zeko and father of Robert, Jason, Chrissie, and Sonny Zeko), Tommy Marks (father of Sonny Marks), and Tina Marks (daughter of James and Jane Marks) apparently were not present during the search of either residence. There is a dispute among the parties as to whether appellants confined Polly Marks and her daughters Shirley Marks and Lisa Marks outside the residence of 428 S. Thor during the search. The plaintiffs contend that Marie Marks and Linda Marks were "restrained" outside 428 S. Thor during the search.
 
 
 22
 The plaintiffs allege that officers detained and searched all persons who were initially inside the two residences and all who entered during the law enforcement operation. Appellants say they searched "some," but not all, of the persons present. It is unclear which officers searched which plaintiffs. However, the parties agree that defendant Coker conducted the searches of women and children.[21] Appellants also claim that the Markses were generally very disruptive during the search and continually attempted to hide items that were subject to seizure.
 
 
 23
 Approximately 200 items of personal property were seized at 802 S. Thor, and approximately 440 items, including seven canisters of money, were seized and removed from 428 S. Thor. Prior to leaving the residences, the officers photographed and videotaped much of the property, including the canisters, as well as the persons present. The property included jewelry, electronic equipment, cashier's checks, car titles, and cash sewn in blankets and stashed in boxes. No cash was seized at the 802 S. Thor residence.
 
 
 24
 Extraordinary sums of cash were discovered during the search of 428 S. Thor. Because money was not specifically listed in the search warrant, the officers did not seize approximately $10,000 in cash when it was first discovered. However, when another significant amount was discovered and its discovery reported to Freeman by telephone, the officers were authorized by Allen and Freeman to begin seizing all the cash they uncovered. The officers did so and seized money they found in several locked boxes and canisters in a chest of drawers with a false bottom. Robert Marks was arrested while some of the cash was being discovered.
 
 
 25
 Later in the search, the officers telephoned Freeman and Allen and were directed by them to take all the confiscated property and transport it to the police station for identification. The property the officers took to the station included that confiscated from various places throughout the residences and from the persons of those Marks family members present during the search. At the station, officers cross-referenced their inventory lists from the search at 802 S. Thor with the items placed in the property room, continued inventorying items from 428 S. Thor, and counted the money found at 428 S. Thor.
 
 
 26
 James and Grover Marks accompanied the police and property to the police station. The Internal Revenue Service sent two investigators to the station to observe the counting of the money. The counting and inventorying of the money was ultimately completed around 1:00 a.m. June 19, 1986. A total of approximately $1,600,000 was counted by the police.
 
 
 27
 On June 23, the City was served with a Writ of Garnishment in the amount of $42,864.89. The plaintiff in the garnishment action was an individual named Paul Richards. The defendants in the garnishment were several of the plaintiffs in this case, including Grover, Marie, James, and Jane Marks. Also on June 23, the IRS served a series of liens and notices of seizure on the City of Spokane for the cash seized from Grover Marks' residence pursuant to levies made against several members of the Marks family. The levies were served on the City before the Spokane Superior Court ruled that the money seized during the search of 428 S. Thor should be returned to the owner of the residence.
 
 
 28
 The IRS seized all of the cash in the City's custody, except for $43,000 that was subject to the garnishment previously served against the City. The City deposited the $43,000 into a separate bank account to cover the garnishment. The City then paid $42,864.89 into the Spokane County Superior court as ordered on July 31 and paid the remaining balance of the bank account, $357.79, to the IRS pursuant to the original notices of levy and seizure. In accordance with a stipulation entered into by the parties, the IRS returned $519,000 and later, as part of a tax settlement, returned all but $300,000 of the remaining $1 million.
 
 
 29
 Also in July 1986, the Spokane Police Department conducted a viewing of the property seized during the June 18 search. According to appellants, the viewing was limited to burglary victims: (1) who could prove that they were the victim of a crime during the last three years that had been reported to a law enforcement agency; (2) a copy of whose crime report could be located in law enforcement records; and (3) whose report described the items stolen. Approximately 35 of these crime victims identified numerous items they claimed had been stolen from them.
 
 B. Procedural Background
 1. State Court
 
 30
 Pursuant to a Washington state criminal rule allowing persons aggrieved by an unlawful search and seizure to move the state court for the return of the property on the ground that it was illegally seized, the Markses moved for return of the seized cash on June 20, 1986, two days after the search. That same day, after an expedited hearing on the matter, the state court, Magistrate Judge Ramond R. Tanksley, ordered the return of the approximately $1.6 million in cash that had been seized from Grover Marks' residence at 428 S. Thor, ruling that the cash was outside the scope of the warrant and that the plain view exception to the warrant requirement did not apply because, although the officers were legally present and the cash was inadvertently discovered, it was not immediately identifiable as evidence of a crime.
 
 
 31
 After obtaining the order directing the return of the cash, the Markses moved for the return of the other seized property or in the alternative to suppress the property as evidence. In October and November 1987, the Spokane Superior Court ordered the State of Washington to return to the Markses all the property that had not been identified as stolen. The items that had been characterized as stolen, remained subject to further proceedings in court.
 
 
 32
 Earlier, the State of Washington had charged James Marks, Jane Marks, Grover Marks, and Marie Marks with trafficking in stolen goods. In May 1988, the Markses moved to suppress all evidence seized during the search and to dismiss the criminal charges against them. After a lengthy evidentiary hearing, the Spokane court held that the police exceeded the authorization in the search warrant, conducted illegal searches because the searches and seizures made by the officers were unreasonable and the warrant itself failed to particularize the items to be seized, and that the officers were guilty of mismanagement and governmental misconduct, in violation of the Fourth and Sixth Amendment of the United States Constitution, Article I, section 7 of the Washington State Constitution, and Washington state criminal laws. The court suppressed all the seized evidence, dismissed the underlying criminal charges, and ordered the police to return all confiscated property to the Markses.
 
 
 33
 The State of Washington appealed the state trial court's order dismissing the charges and directing the return of property which had been identified as stolen. However, the state did not appeal the order suppressing all the evidence seized. The City of Spokane joined the appeal of the order directing return of the property because the City had custody of the items and was made subject to an order to show cause at the request of the Markses. The Washington Supreme Court reversed the trial court's order of dismissal and reinstated the criminal charges, holding that dismissal was unwarranted because suppression of the evidence eliminated any prejudice caused by the governmental misconduct, and remanded the matter to the trial court for an evidentiary hearing to determine who had the lawful right to possession of the disputed property. State v. Marks, 114 Wash.2d 724, 790 P.2d 138, 145 (1990). Ultimately, the criminal charges against Grover and Jane Marks were dismissed, and Marie and James Marks entered "Alford" pleas to reduced charges and paid fines.
 
 2. Federal Court
 
 34
 In June 1989, the Markses instituted the two, now consolidated, civil rights actions against the City of Spokane, Spokane County, and the individual defendants out of which this appeal arose. The plaintiffs in Cause No. C-89-423-AAM (the case primarily involving events at the 802 S. Thor residence) are James Marks, Jane Marks, Tommy Marks, David Marks, Marie Marks, Michael Marks, Sonny Marks, Linda Marks, and Tina Marks. The plaintiffs in Cause No. C-89-425-AAM (the case primarily involving events at the 428 S. Thor residence) are the Gypsy Church of the Northwest, a voluntary association, by and through Grover Marks, trustee; and Grover Marks, Marie Marks, Marguerite Marks, Steven Marks, Robert Marks, Polly Marks, Richard Marks, Shirley Marks, Lisa Marks, Steve Marks, Larry Zeko, Laura Zeko, Robert Zeko, Jason Zeko, Chrissie Zeko, Sonny Zeko, Peter Marks, and Buck Marks.
 
 
 35
 The plaintiffs sued the City of Spokane and city employees Robert Allen, Robert Bailor, John Clarke, Denise Coker, Earl Ennis, Larry Freeman, Monte Gaunt, William Grub, Clifford Harding, Donald Johnson, Stephen Keane, Ken Krogh, Michael Lavelle, Larry Lindskog, Jack Neumiller, Andrew Pavlischak, Gerald Poindexter, Richard Poole, Sheldon Reeve, Nicolis Stanley, Robert VanLeuven, and Michael Yates and Spokane County, Larry Erickson, and Rick Grabenstein.
 
 II. OVERVIEW
 
 36
 In the three orders we are reviewing, the district court first denied qualified immunity to all appellants[22] and then held most of them liable for their participation in an unlawful search conducted pursuant to an invalid warrant.[23] The court held that the warrant was overbroad and that it was invalid because it (1) authorized a "general" search in violation of the Fourth Amendment's requirement that warrants describe with particularity the items to be seized and (2) authorized the search of all persons on the premises for reasons other than officer safety without the requisite individualized probable cause. The court also held that the officers erred in failing to take the necessary actions to gain an understanding of the specific provisions of the warrant and in failing to refer to those provisions while conducting the search. Finally, the court held that disputed facts as to exactly what role particular defendants played in the search and as to what the various defendants did or did not do to the various plaintiffs required that the extent of liability of most of the defendants be resolved at trial.
 
 
 37
 We agree with most of the results reached by the district court in connection with its denials of appellants' motions for qualified immunity, but we reverse in large part its decisions granting summary judgment to plaintiffs on the issue of liability. First, we affirm the district court's denial of immunity to the officers who were involved in obtaining the search warrant, a group that includes the officers who prepared and applied for the warrant--defendants Grabenstein, Reeve and Neumiller[24] --and the two superior officers who authorized them to apply for the warrant--defendants Allen and Freeman. We do so on a basis that differs in some important respects from that relied on by the district court. The district court held that, even though the officers who sought the warrant could not have "harbored an objectively reasonable belief" that the warrant was supported by probable cause to search all persons or that it described the items to be seized with sufficient particularity, they were entitled to qualified immunity because the affidavit and draft warrant had been approved by an attorney and the magistrate had issued the warrant. However, it then denied them qualified immunity on the ground that their failure to "constant[ly] reference" the warrant during the search was unreasonable.[25] We reject the district court's reasoning in part. We hold instead that the qualified immunity motion must be denied because the officers unreasonably obtained and executed a warrant to search all persons present for evidence. We rely principally on the fact that the affidavit that supported the warrant not only was lacking in any indicia of probable cause to search all persons but itself requested permission only to search two persons--James and Grover Marks--for evidence of the crime under investigation--and all others solely for officer safety.
 
 
 38
 As to those officers who actively participated in the search of the persons present at the premises during the execution of the warrant, we affirm the decision of the district court denying them qualified immunity. Once again, we do so for a different reason, at least in part, than was relied on by the district court. Once again, we do not rely on the officers failure to examine the warrant or apprehend its precise provisions. Instead we conclude that regardless of the terms of the warrant, the law was clearly established that the officers could not search all persons present on the premises in the absence of individualized probable cause.[26]
 
 
 39
 The court's denial of qualified immunity to all the officers who participated in the search of the premises but were not involved in obtaining the warrant or in searching persons present is justified, but again on a ground different from that on which the judge relied. On the record before us, we conclude that those officers are not presently entitled to immunity because a material dispute of fact exists: whether the search in which they participated began before or after the warrant arrived.[27] The district court held that whether the search began prior to the issuance of the warrant was a fact in dispute but did not consider the fact material because it had denied immunity to the defendants who participated in the search on a different basis. Because we disagree with the district court's rationale--that the warrant was a general warrant and the search was a general search--we conclude that the disputed fact is material and that, as such, a dispute of material fact exists that bars summary judgment.[28] Accordingly the officers who searched only the premises were not entitled to a summary judgment order granting them qualified immunity.
 
 
 40
 Similarly, as to those officers who only secured the premises and detained those present, but did not search any person or property, we hold that qualified immunity is inappropriate at this stage of the proceedings. Under the facts as alleged by the plaintiffs, the officers secured the premises and detained persons present in furtherance of an illegal, warrantless search. If the search began before the warrant arrived, these officers are not entitled to qualified immunity. Accordingly, because a genuine issue of material fact exists regarding the conduct of appellants who secured the premises, summary judgment on qualified immunity is not appropriate at this time.[29]
 
 
 41
 Finally, in light of the Supreme Court's decision in Whren v. United States, --- U.S. ----, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), we hold that the officers who conducted the traffic stops are entitled to qualified immunity because plaintiffs do not dispute appellants' assertions that probable cause existed to effect the stops.[30] We also conclude that the officers who participated in transporting the seized property to the police station for an off-site inspection are entitled to qualified immunity on the ground that their conduct did not violate clearly established law.
 
 
 42
 Where our decisions on qualified immunity conflict with the district court's decision on liability we necessarily reach and reverse the latter. Specifically, our qualified immunity conclusions require us to reverse the district court's order imposing liability against those officers who only searched, videotaped, or secured the premises at 428 and 802 S. Thor, including those who detained but did not search the persons present. However, we affirm the decision imposing liability against that smaller number of appellants who conducted the search of the persons found on the premises. Because the district court did not treat separately the issue of imposing liability for the obtaining of the warrant, that issue is not properly before us on this appeal. The district court will undoubtedly, however, review that question on remand in light of our parallel ruling on qualified immunity--that, under the circumstances of this case, clearly established law prohibited the obtaining of a warrant for the search of all persons present.
 
 III. SUMMARY JUDGMENT ISSUES
 
 43
 Whether appellants are entitled to summary judgment on the basis of qualified immunity depends upon "whether, in light of clearly established principles governing the conduct in question, the officer[s] objectively could have believed that [their] conduct was lawful." Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir.1993). The two-part analysis we use to apply this standard is: "(1) Was the law governing the official's conduct clearly established? (2) Under that law, could a reasonable officer have believed the conduct was lawful?" Id. Appellants are not entitled to summary judgment on the basis of qualified immunity if a genuine dispute of material fact exists. Pierce v. Multnomah County, 76 F.3d 1032, 1038 (9th Cir.1996); Act Up, 988 F.2d at 872. Plaintiffs, conversely, are only entitled to summary judgment on liability if no material dispute of fact as to the appellants' liability exists for trial. Warren v. Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996).
 
 1. Qualified Immunity
 Obtaining the Warrant
 
 44
 The district court concluded that the affidavit submitted by Grabenstein and Reeve failed to establish probable cause sufficient to support the general "any persons on the premises" searches authorized by the actual warrants: more specifically, it determined that those appellants "could not have harbored an objectively reasonable belief in the existence of probable cause to search any individuals other than Grover and Sonny Marks." ER at 1480. Nevertheless, the court granted them qualified immunity on the issue because they "reasonably relied" on the approval given both by the Spokane County Deputy Prosecutor who approved the affidavit and the draft warrant and the magistrate who signed the warrant. We disagree, and conclude that such approval is insufficient to entitle these defendants to qualified immunity. See Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[31]
 
 
 45
 The conduct of these defendants with respect to the claim at issue falls under the clearly established rule set out in Ybarra v. Illinois, 444 U.S. 1049, 100 S.Ct. 741, 62 L.Ed.2d 737 (1980). In Ybarra, the Court held that
 
 
 46
 Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided simply by pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.
 
 
 47
 Id. at 91, 100 S.Ct. at 342 (emphasis added). While holding open the question of the constitutional propriety of a warrant that specifically authorized the search of "unnamed persons in a place," the Court did so only to the extent that such a warrant is "supported by probable cause to believe that persons who will be in the place at the time of the search will be in possession of [items subject to seizure]." Id. at 92 n. 4, 100 S.Ct. at 342 n. 4. See also Greenstreet v. County of San Bernardino, 41 F.3d 1306, 1309 (9th Cir.1994) ("A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein.").
 
 
 48
 Accordingly, unless supported by probable cause as to each individual present, the warrants here were invalid, and the conduct of the officers in obtaining the warrants violated clearly established law of which a reasonable officer would have known. We agree with the conclusion of the district court that the warrants' authorization to search "any persons on the premises" was not supported by probable cause, and that "Grabenstein and Reeves could not have harbored an objectively reasonable belief" that such probable cause was shown. First, the affidavit submitted in support of the warrant did not seek authorization to search all persons present for evidence. The affidavit stated that the affiant sought a warrant for the purpose of searching persons described as "James Marks, Grover Marks, and any other person on the premises at the time of warrant execution for officer safety." (emphasis added) The draft warrant Grabenstein and Reeve submitted along with the affidavit contained a different description of the "persons" to be searched, however. It sought the broader, indeed unlimited, authorization to detain and search "James S. Marks, aka 'Sonny' and all other persons on the premises of S. 802 Thor, Spokane County, Washington" and "Any persons on the premises of S. 428 S. Thor, Spokane County Washington." Unlike the affidavit, the draft warrant did not contain the officer safety limitation as to persons who happened to be on the premises.[32]
 
 
 49
 Second, while the facts presented in the affidavit clearly supported the conclusion that stolen property was present at 428 S. Thor and 802 S. Thor, it did not establish probable cause to search all persons present for evidence of the crimes. The affiant stated that several robbers had provided information that stolen property was sold by informant White to persons at those two addresses and that the affiant himself had orchestrated and conducted surveillance of undercover sales of stolen property by White to James "Sonny" Marks and one other unidentified person at the residences. However, no-one other than James Marks, Grover Marks, Tommy Marks, a "gypsy" named "Terry", and an unidentified "female" at 428 S. Thor, was even mentioned in the affidavit as a suspect, other than a vague reference to "Gypsies" generally. While the affidavit may have established probable cause to search James Marks, and possibly also Grover Marks, Tommy Marks, and a "gypsy" named "Terry" for evidence of trafficking in stolen goods, none of the statements in the affidavit established probable cause to detain and search any other individuals for evidence. A warrant to search all "Gypsies" found at a particular location would, of course, be invalid--although it would in fact be more specific or limited than the all persons warrant issued here.
 
 
 50
 The actions of the officers who applied for a warrant to search all persons present for evidence of crimes when the affidavit they submitted in support of that warrant (1) clearly stated that the officers sought only to search two individuals, James Marks and Grover Marks for that purpose, and (2) obviously failed to establish probable cause to search persons other than those identified in the affidavit, "violate[d] clearly established statutory or constitutional law of which a reasonable officer would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). While the first error alone might not serve to deprive the officers of qualified immunity, the combination of the first and the second clearly does.
 
 
 51
 We reject the conclusion of the district court that the officers are insulated by qualified immunity because of their reliance on the approval given by an attorney and the magistrate who signed the warrant. We recently noted in United States v. Kow, 58 F.3d 423 (9th Cir.1995), that the fact that a warrant was reviewed by two Assistant United States Attorneys and signed by a magistrate does not amount to "exceptional circumstances" on the basis of which a reasonable officer could rely on a facially invalid warrant. Id. at 428. We have held that "absent specific assurances from an impartial judge or magistrate that the defective warrant is valid despite its overbreadth, a reasonable reliance argument fails." Id. at 429. The officers applying for the warrant in this case did not ask for, nor did they receive any such specific assurances from the magistrate issuing the warrant. To the contrary, it appears that the magistrate may have been misled by the terms of the request set forth in the affidavit, and may not have noticed the conflict in the papers submitted to him. Accordingly, we hold that the officers who obtained the warrant authorizing searches of "any persons on the premises" are not entitled to qualified immunity for that conduct.[33]
 
 
 52
 Search of "Any Persons"
 
 
 53
 We also affirm the district court's denial of qualified immunity as to the appellants who participated in the search of persons who were present when the warrant was executed. As we have just stated, the warrant at issue in this case was invalid insofar as it authorized a search of "any person present." Once again, under the clearly established law of Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person." As noted above, the affidavit submitted in support of the warrant application at most established probable cause to search Grover, Sonny, and Tommy Marks, as well as a "gypsy" named "Terry." Insofar as the warrant purported to authorize searches of "any persons on the premises," it was invalid, as unsupported by particularized probable cause.
 
 
 54
 Notwithstanding the warrant's invalidity, appellants who searched the various plaintiffs are nevertheless entitled to rely on the warrant, and will not be stripped of qualified immunity, so long as their reliance is objectively reasonable. United States v. Leon, 468 U.S. 897, 920-921, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984). However, an officer is not entitled to rely on a warrant which is "so facially overbroad as to preclude reasonable reliance by the executing officers." Id. at 923, 104 S.Ct. at 3420-21; See also United States v. Luk, 859 F.2d 667, 677 (9th Cir.1988); United States v. Crozier, 777 F.2d 1376, 1381 (9th Cir.1985). The burden is on appellants to prove that their reliance on the warrant was objectively reasonable. United States v. Michaelian, 803 F.2d 1042, 1048 (9th Cir.1986).
 
 
 55
 In this case, if the overbreadth of the warrant with respect to searching "any person present" was not immediately apparent at the pre-search briefing session, its invalidity certainly became apparent, at the latest, when the officers were confronted with the duty of searching dozens of people, including children, even to the point of "inspecting" the diaper of an infant. In whatever limited circumstances a blanket "any person present" warrant might survive Ybarra 's clear requirement of "probable cause particularized with respect to [each] person," 444 U.S. at 91, 100 S.Ct. at 342, the circumstances of the execution of this warrant made it unreasonable for an officer to believe that it was not facially overbroad.
 
 
 56
 Appellants argue that a search of all persons was justified because "[u]nder the facts and circumstances confronting the officers, they justifiably concluded that they were in a 'den of thieves.' " We have not previously commented on a "den of thieves" theory in a published opinion. However, we believe that a warrant to search "all persons present" for evidence of a crime may only be obtained when there is reason to believe that all those present will be participants in the suspected criminal activity. That is not the case here, and would not be the case with respect to a raid on any family home where innocent family members or friends might be residing or visiting. An all persons present warrant might be appropriate for a different kind of locale--one dedicated exclusively to criminal activity--for example, a building or apartment used as a crack house, a barn used as a methamphetamine lab, or a warehouse used exclusively as a storage place for arms. Here, as we have noted, however, large numbers of family members, including children, were, as the officers might have anticipated, present before and during the search. The approach we adopt was set forth almost a quarter century ago by the New Jersey Supreme Court, which stated that
 
 
 57
 [a] showing that lottery slips are sold in a department store or an industrial plant obviously would not justify a warrant to search every person on the premises, for there would be no probable cause to believe that everyone there was participating in the illegal operation. On the other hand, a showing that a dice game in a manhole or in a barn should suffice, for the reason that the place is so limited and the illegal operation so overt that it is likely that everyone present is a party to the offense.
 
 
 58
 State v. DeSimone, 60 N.J. 319, 288 A.2d 849, 850 (1972); see also 2 W. LaFave, Search and Seizure § 4.5(e), at 546 (3d ed. 1996) (endorsing the limited rationale outlined in DeSimone as the proper analysis for "all persons present" warrants.).
 
 
 59
 The cases cited by appellants do not support their argument. They consider the reasonableness of an officer's conclusion that items found in plain view constitute incriminating evidence and do not consider the question of suspending the individualized probable cause requirement governing searches of persons. State v. Legas, 20 Wash.App. 535, 581 P.2d 172, 176 (1978); State v. Adame, 37 Wash.App. 94, 678 P.2d 1299 (1984). In this case, appellants' "den of thieves" argument is simply a more sophisticated and beguiling version of the kind of justification forbidden by Ybarra: "Persons detained during a search for evidence cannot be searched according to Ybarra simply because they are there," United States v. Vaughan, 718 F.2d 332, 335 n. 7 (9th Cir.1983). Accordingly, those appellants who conducted indiscriminate searches of all persons present at the family residences failed to act in an objectively reasonable manner, and are not entitled to qualified immunity.
 
 Officers Who Searched the Premises
 
 60
 The district court relied on our decision in Guerra v. Sutton, 783 F.2d 1371 (9th Cir.1986), to reach its conclusion that the officers in this case had a duty to read and refer to the specific authorizations in the warrant during the search. We have not found nor do the plaintiffs point us to any authority ascribing to police officers a duty personally to read the search warrant they are executing or to refer to that warrant during its execution. The plaintiffs, like the district court, rely on Guerra, a case which does not support their argument. While we did hold in Guerra that officers executing a search warrant have a duty to inquire as to the nature, scope, and details of the warrant, we also made it clear that it is not necessary for "all or even any" of the officers executing the warrant "to actually see " it. Id. at 1375. "Officers conducting a search should read the warrant or otherwise become fully familiar with its contents, and should carefully review the list of items which may be seized." United States v. Whitten, 706 F.2d 1000, 1009-10 (9th Cir.1983) (emphasis added), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).
 
 
 61
 In Guerra, we held that INS agents who failed "to inquire as to the nature and scope" of the warrant they were executing were not entitled to qualified immunity. Id. at 1375. We denied the agents immunity because it was clear that they had not sought to determine specific information regarding what the warrant authorized them to do. Id. In contrast to the officers who executed this warrant, the Guerra agents had "between four and six different understandings of what kinds of warrants the local police obtained and who and/or what they were for," id. at 1375 n. 5, and were not given an advance briefing as to the source and extent of their authority to enter and search, id. at 1375.
 
 
 62
 Prior to the searches of the two residences, the officers in the case before us were briefed about the warrant being sought, the nature of the criminal investigation--that investigators had substantial evidence that persons at the residences were trafficking in stolen property--and the nature of the evidence to be seized--primarily jewelry, silverware, and electronic and photographic equipment stolen in household burglaries. Also, many of the officers had participated in the pre-search investigation of the alleged fencing operation. These officers were particularly familiar with the nature of the items sought. Although every officer did not attend the formal briefing, each officer was informed in some way by authorized personnel regarding the scope of the search. Thus, the district court erred in concluding that clearly established law imposed a duty on the officers, who had generally fulfilled their duty to become informed as to the scope of the warrant, to read or refer to the signed warrant while they searched. Accordingly, we hold that the district court erred in denying the defendants qualified immunity on that basis.
 
 
 63
 We also hold that the district court erred in concluding that the searches were conducted pursuant to an invalid "general warrant." Instead, we hold that the warrant at issue satisfied the Fourth Amendment requirement of particularity insofar as it authorized a search of the premises for the types of property described therein.
 
 
 64
 The requirement that a warrant not be a general one is in part a function of the probable cause rule and is in part derived from the fourth amendment requirement that warrants be ones "particularly describing the place to be searched, and the persons or things to be seized."
 
 
 65
 United States v. Hillyard, 677 F.2d 1336, 1339 (9th Cir.1982).
 
 
 66
 On this warrant, in the space designated for describing the things to be seized, the words "see attached lists" were typed. Attached to the warrant were the lists that had been attached to the affidavit--the list of the items that informant White had sold to individuals at the two residences during the police investigation and the sixteen stolen property reports listing the items stolen from the property owners who filed the reports.[34]
 
 
 67
 The stolen property lists attached to the warrant included descriptions of hundreds of items of property, mostly jewelry and silverware. The descriptions varied from detailed--"Black Hills Gold Earrings (Landstrom's)" [along with a detailed drawing]; "camera [serial number] B2103134 [brand] Nikon [model] FE-2 Black"--to vague--"A gold chain;" "Bottle of Liqueror" [sic] and "3 Quarters." The list prepared by the officers also described the items to be seized in varying degrees of detail. That list included rather general descriptions such as "A gold rope chain," "A flat gold chain," "2 gold bands," but also included more detailed descriptions, such as "A men's Bulova silver colored watch, serial # C92458," "A silver mask earring," and "Queens Lace Sterling silverware (3 crab forks, 2 butter knives, 3 salad forks, 3 dinner forks, 5 teaspoons, 3 soup spoons)."
 
 We have held that:
 
 68
 [t]he specificity required in a warrant varies depending on the circumstances of the case and the types of items involved. Warrants which described generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible. In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officer can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.
 
 
 69
 United States v. Spilotro, 800 F.2d 959, 963 (9th Cir.1986) (internal citations omitted).
 
 
 70
 As opposed to containing only a description of general categories of property, the warrant in this case incorporated itemized lists with descriptions, the vast majority of which were very detailed. Moreover, the affidavit the officers had submitted in support of the warrant established probable cause to believe that extremely large quantities of jewelry would be found on the premises. This is not a case in which officers were investigating the theft of a few specific and easily described pieces of jewelry that could have been intermingled with the residents' personal jewelry collection. The affidavit stated that informant White told the affiant he had sold "nearly all" of the property he had stolen in sixteen burglaries to individuals living at the residences to be searched. Finally, for the most part, the descriptions of the items sought were as detailed as they possibly could have been, having been written by the property owners from whom the items were stolen, making it unlikely that further investigation would have made it possible to describe the items sought with greater particularity. Cf. Kow, 58 F.3d at 428 n. 2 (noting that the government's decision to refrain from further investigation and yet rely on the lack of specific information to justify the lack of particularity in the warrant is troubling and that "[t]o the extent that it was difficult for the government to create a more particularized warrant, the government may be to blame").
 
 
 71
 We hold that the warrant was sufficiently particular and thus valid with respect to the search of the residences for stolen goods. Accordingly, we conclude that insofar as the district court's decision to deny the officers qualified immunity depended on its conclusion that the warrant was unconstitutionally broad or constituted a general warrant, it was in error.
 
 
 72
 However, we affirm the denial of qualified immunity to appellants who participated in the search of the premises on other grounds. With respect to the search at the principal location, 428 S. Thor, a material dispute of fact exists as to when the search began. The parties are in sharp disagreement as to whether officers forcibly entered the 428 S. Thor residence over the occupants' objections and whether they then began searching the residence without the occupants' consent and without being in possession of a warrant. Both parties agree that several officers entered the residence before the warrant was signed by the magistrate at 3:10 p.m. and before the warrant arrived at the premises at approximately 3:30 p.m. How the officers entered the residence is disputed, however. The appellants contend that the plaintiffs consented to the officers' entry and even consented to a warrantless search of the premises. They further contend that the officers declined to begin searching despite the plaintiffs' consent and waited for the arrival of the warrant before beginning the search. The plaintiffs, however, claim that defendants VanLeuven and Keane forcibly entered 428 S. Thor without the occupants' consent. They also contend that the officers who entered the residence began searching before the warrant arrived or was signed. This dispute as to whether the officers who searched entered the residence lawfully (pursuant either to plaintiffs' consent or some other exception to the warrant requirement) and whether they began searching before the warrant arrived constitutes a dispute of material fact.[35] Because the conduct alleged by plaintiffs would be clearly unlawful and because a material dispute of fact exists, we hold that the appellants who participated in the search of 428 S. Thor are not entitled to summary judgment on the basis of qualified immunity for their conduct related to searching this residence. Pierce v. Multnomah County, 76 F.3d at 1038; Act Up, 988 F.2d at 872.
 
 
 73
 As to the search at 802 S. Thor, as noted above plaintiffs have not directed us to evidence in the record which would refute appellants' assertion that James Marks initially consented to the search of his home prior to the arrival of the warrant. However, as we also noted, the record supports the inference that whatever consent Marks initially gave was withdrawn at some point during the search. Accordingly, when the search began is material here as well; a nonconsensual search could only have been lawful pursuant to a warrant, or some exception to the warrant requirement found not to exist by the district court. Because genuine issues exist regarding when the search began and regarding Marks's consent, the officers who searched the 802 S. Thor premises are not entitled to qualified immunity regarding their participation in the search.[36]
 
 Officers Who "Secured" The Premises
 
 74
 Officers who "secured" the search premises, or detained but did not search the persons present are also not entitled to qualified immunity at this stage of the proceedings because of the dispute over when the search began. Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595-96, 69 L.Ed.2d 340 (1981), would in this case, authorize a brief detention of the occupants of the homes for a reasonable period of time "while a proper search [was] conducted." It would not, however, authorize detaining the occupants in furtherance of an illegal search--a search under the circumstances alleged by the plaintiffs. Accordingly, summary judgment on qualified immunity grounds is inappropriate at this time. As a result, we need not consider the district court's alternative theory that the length of the detention might have rendered it unreasonable.
 
 Videotaping of Search
 
 75
 We hold that appellant Lavelle, a civilian employee of the Spokane City Police Department, who videotaped portions of the search is also not entitled to qualified immunity at this time, but only because of the factual dispute as to whether the search of the premises was unlawful because it commenced prior to the issuance or arrival of the warrant. Lavelle's videotaping was indisputably performed for legitimate law enforcement purposes.[37] See Ayeni v. Mottola, 35 F.3d 680, 684 (2d Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1689, 131 L.Ed.2d 554 (1995) (denying qualified immunity to a United States Secret Service agent who allowed a television crew from a weekly news magazine program to videotape the execution of a search warrant authorizing the search of an apartment). However, because material disputes of fact exist as to whether the officers whom Lavelle accompanied began searching without a warrant and because Lavelle could be liable for participating in a search that commenced without a warrant--even if only by videotaping it--we hold that he is not entitled to qualified immunity at this time.
 
 Traffic Stops
 
 76
 The district court denied qualified immunity to defendants Weir, Grub, Bailor and Lindskog for their participation in the two traffic stops which occurred prior to the execution of the warrants, concluding that a genuine issue of material fact existed regarding pretext. Thereafter, the Supreme Court handed down its decision in Whren v. United States, --- U.S. ----, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), rejecting the argument that "the constitutional reasonableness of traffic stops depends on the actual motivations of the officers involved." Id. at ----, 116 S.Ct. at 1774. The Court held that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. at ----, 116 S.Ct. at 1772. The district court in this case found that with respect to each traffic stop appellants alleged probable cause to make the stop at issue and that plaintiffs did not rebut those allegations. Because appellants do not challenge the existence of probable cause, we reverse the district court's decision denying qualified immunity to the officers involved. Under Whren, the officers' conduct does not constitute a Fourth Amendment violation.
 
 
 77
 We note, however, that in the "Background" section of its January 21, 1994, order granting in part plaintiffs' summary judgment motions, the district court stated that, according to appellants' representation of the facts, after the officers stopped their car, David and Jane Marks and Laura and Chrissie Zeko were "ordered to return to the house where they would await the search warrant." The district court did not address separately the lawfulness of this "order," perhaps considering the issue subsumed in the question of pretext. Appellants' brief asserts that it was appellant Grub who issued the "order." Plaintiffs do not contend otherwise. However, the record contains only the barest of facts regarding the incident. Accordingly, we are unable at this time to evaluate the lawfulness of this apparent seizure, and leave it to the district court to resolve the matter in the first instance. We therefore affirm the part of the order denying qualified immunity to appellant Grub, albeit for different reasons than relied on by the district court.
 
 
 78
 Seizure of Property for Off-Site Inspection
 
 
 79
 Finally, we hold that appellants are entitled to qualified immunity for their conduct related to the off-site inspection at the police station of seized property because we conclude that the removal of the goods to the station and their inspection at that location did not violate clearly established law. As noted above, we take no position on the initial seizure of any particular items.
 
 2. Liability
 
 80
 In reaching our holdings on the appellants' qualified immunity claims, we have rejected some of the reasoning relied on by the district court both in its qualified immunity decisions and its orders granting summary judgment to the plaintiffs on the issue of liability. We have, moreover, come to different conclusions in some instances regarding the availability of qualified immunity to certain appellants. In doing so we necessarily require the reversal of the district court's grant of partial summary judgment to the extent that it conflicts with the approaches or results we have outlined above.
 
 
 81
 Specifically, we reverse the decision granting summary judgment against those officers who searched the premises at 428 S. Thor and 802 S. Thor in light of our conclusion that a genuine issue of material fact exists regarding the time at which the search began and also regarding James Marks's consent. For the same reasons, we also reverse the decision granting summary judgment against appellants who secured the premises by detaining, but not searching, persons who were present when the officers arrived. We affirm summary judgment against those officers who participated in the search of persons present at the premises. A judgment in favor of all persons searched is appropriate, except for those persons as to whom probable cause existed. We leave it to the district court to determine initially whether cause existed as to any of the individuals mentioned in the affidavit other than James Marks--as to him such cause unquestionably exists.
 
 IV. ATTORNEY'S FEES
 
 82
 The plaintiffs seek attorneys' fees and costs under 42 U.S.C. § 1988 for their appeal. A party may be awarded attorney fees as a prevailing party at an interlocutory stage of the proceeding if the party "prevails on the merits as to one or more of his or her claims." Ward v. County of San Diego, 791 F.2d 1329 (9th Cir.1986) (citing Hanrahan v. Hampton, 446 U.S. 754, 757-58, 100 S.Ct. 1987, 1989-90, 64 L.Ed.2d 670 (1980)). It is not necessary that the party win a judgment that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment: "The fact that the dispute between the parties may continue does not preclude a fee award." Animal Lovers Volunteer Ass'n, Inc. v. Carlucci, 867 F.2d 1224 (9th Cir.1989). Plaintiffs here have won more than the mere right to proceed to trial. We affirm the district court's liability decision regarding those officers who searched persons, and certain plaintiffs have, accordingly, conclusively established their entitlement to relief. We have also made other determinations that will require decisions in plaintiffs' favor. We therefore hold that attorneys fees are appropriate in those instances. We remand the question of the amount of fees to the district court.
 
 
 83
 The plaintiffs also submit that they should be entitled to recover attorneys' fees and costs, under 28 U.S.C. § 1927, on the ground that appellants' appeal on the issue of qualified immunity has unreasonably and vexatiously multiplied the proceedings and costs in this case. We disagree and deny that request.
 
 V. CONCLUSION
 
 84
 We conclude that the district court erred in its determination that none of the appellants is entitled to qualified immunity for the search of the residences because they failed to read the signed warrant or otherwise inquire into the warrant's scope, or, if they did read it, failed to refer to it during the search. We also reject its conclusion that the warrant was overbroad because it failed to designate with sufficient specificity the items to be seized. However, we hold that the officers and the video technician who participated in the search of the premises, as well as those officers who secured the premises, are not entitled to qualified immunity at this stage of the proceedings because a material dispute of fact exists as to whether the search began before or after the warrant arrived and as to whether the search at 802 S. Thor was consensual. We also hold that those officers who conducted searches of persons present at the premises are not entitled to qualified immunity because the provision of the warrant which authorized the searches of all persons was contrary to established law as any reasonable officer should have known.
 
 
 85
 We affirm the district court's denial of qualified immunity to the appellants who participated in obtaining the warrant, on different grounds than those on which the district court relied. We conclude contrary to the decision of the district court that those officers could not reasonably rely on the approval of an attorney and a magistrate. We hold instead that the officers who were involved in obtaining the warrant are not entitled to immunity for obtaining a warrant that authorized the search of all persons present on the premises. We also hold that those officers are not entitled to qualified immunity for participating in the search of the persons who were present at the premises and that they are not entitled to immunity for instructing others to do so.
 
 
 86
 Finally, we reverse the decision denying immunity to those officers who participated in the traffic stops, in light of the Supreme Court's decision in Whren v. United States, although we affirm for the present the denial as to the officer who ordered the occupants of a vehicle to return to 428 S. Thor.
 
 
 87
 In reaching these conclusions we necessarily reach some of the district court's decisions on liability. We reverse the district court's liability judgment in favor of plaintiffs to the extent that it is based on the conclusion that the officers acted pursuant to a warrant that was invalid with respect to the searching or securing of the premises. Conversely, we affirm the judgment insofar as it holds liable those who conducted searches of persons other than persons as to whom the affidavit in support of the warrant established probable cause.
 
 
 88
 There still remain for resolution a number of factual issues as to which officers did what to whom and under what circumstances. These matters cannot be resolved on this record on interlocutory appeal. We leave them to further proceedings in the district court.
 
 
 89
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 
 *
 The Honorable A. Wallace Tashima was a United States District Judge for the Central District of California, sitting by designation, when this case was argued. He has since been appointed to this court
 
 
 [1]
 We refer to the individual defendants as officers for convenience. However, one of the City defendants, video technician Michael Lavelle, is an employee of the Spokane City Police Department and not a police officer
 
 
 [2]
 The County defendant is Detective Rick Grabenstein. Another county law enforcement officer, Sheriff Larry Erickson is a defendant in this litigation. He is not a party to this interlocutory appeal, however
 
 
 [3]
 Unless otherwise qualified, the term "defendants" will refer to appellants and the municipalities collectively
 
 
 [4]
 In October 1989, the defendants filed counterclaims against the Marks plaintiffs, alleging that some of the plaintiffs had violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"). The district court dismissed defendants' RICO counterclaims in September 1991. In June 1993, the district court dismissed a separate action, originally filed in state court, in which the plaintiffs alleged that the defendants' RICO counterclaims violated their civil rights and that, by filing the counterclaims, defendants committed the torts of malicious prosecution, abuse of process, outrage, and negligent infliction of emotional distress
 
 
 [5]
 Judge McDonald agreed with Judge McNichols, however, that the municipal defendants, the City of Spokane and Spokane County, were estopped from relitigating the issue of the legality of the search
 
 
 [6]
 In this order, the district court also reconsidered the defendants' motion for summary judgment as to certain claims on the grounds that: (1) the plaintiffs' alleged injury was not caused by a custom, policy, or practice of the County or the City and (2) there was no evidence that the defendants' actions were motivated by racial animus. It declined to grant summary judgment on the issue of municipal liability, holding that, viewing the evidence in the light most favorable to the non-moving party, "a reasonable jury could find proof of customs, policies, or practices that would lead to municipal liability." Judge McDonald did, however, grant summary judgment in favor of the defendants on the claims alleging racial animus, concluding that the plaintiffs set forth no facts that would support a finding that the defendants acted with discriminatory intent. These portions of the October 21, 1993 order are not before us
 
 
 [7]
 We need not consider whether we have jurisdiction over Reeve's appeal from an order postponing a decision on qualified immunity, see, e.g., Workman v. Jordan, 958 F.2d 332, 335 (10th Cir.1992) (holding that orders postponing a decision on qualified immunity are immediately appealable), because his subsequent appeal of the district court's denial of qualified immunity for some of his conduct rendered his first appeal moot
 
 
 [8]
 In Chuman v. Wright, 960 F.2d 104, 105 (9th Cir.1992), we recognized an exception to the general rule that a valid notice of appeal divests the district court of jurisdiction over all but tangential matters. This exception applies in cases in which the district court certifies that the defendant's interlocutory appeal is "frivolous" or "forfeited." See Apostol v. Gallion, 870 F.2d 1335, 1339 (7th Cir.1989) (explaining that a frivolous qualified immunity claim is one that is unfounded, "so baseless that it does not invoke appellate jurisdiction" and that a forfeited qualified immunity claim is one that is untimely or dilatory). The Supreme Court recently endorsed the district court's power to certify a defendant's interlocutory appeal of the denial of qualified immunity as frivolous or forfeited as a means of protecting civil rights plaintiffs from abusive successive pre-trial assertions of qualified immunity. Behrens v. Pelletier, --- U.S. ----, ---- - ----, 116 S.Ct. 834, 840-41, 133 L.Ed.2d 773 (1996)
 In the instant case, Judge McDonald certified appellants' interlocutory appeal as "procedurally frivolous" based on his understandable belief that the appeal prior to resolution of the plaintiffs' summary judgment motion was unwarranted because it could result in a ping-ponging between the appellate and trial courts in contravention of the our circuit's limit of one pre-trial interlocutory appeal for defendants claiming qualified immunity. We had articulated that rule in Nelson v. Silverman, 999 F.2d 417, 418-19 (9th Cir.1993) (following Pelletier v. Federal Home Loan Bank of San Francisco, 968 F.2d 865 (9th Cir.1992), holding that "a defendant may bring only one-pre-trial appeal of a denial of qualified immunity.").
 The district court issued its decision before the Supreme Court's decision in Behrens v. Pelletier, --- U.S. ----, ----, 116 S.Ct. 834, 840, 133 L.Ed.2d 773 (1996), which reversed our decision in Pelletier. In Behrens, the Court held that a defendant may appeal both the district court's denial of a motion to dismiss on the basis of qualified immunity and a subsequent denial of summary judgment on the basis of such immunity. Behrens, --- U.S. at ----, 116 S.Ct. at 840. Thus, the Court has decided, over Justice Breyer's vigorous objection, id. at ----, 116 S.Ct. at 842, that a defendant claiming qualified immunity may indeed have two bites at the appellate apple. Id. at ----, 116 S.Ct. at 840. Accordingly, the district court's rationale for its determination of frivolity is no longer tenable, and we see no reason to consider it further here.
 
 
 [9]
 Before the district court, the plaintiffs argued that appellants' interlocutory appeal was waived because they could have filed an appeal from Judge McNichols' May 30, 1990 order denying appellants' motion to dismiss on the basis of qualified immunity. The district court did not rule on the plaintiffs' waiver motion in the November 24, 1993 order. However, in a March 2, 1994 order, the court denied the plaintiffs' renewed motion to certify the interlocutory appeal as waived. The plaintiffs renew this argument on appeal and we reject it. Where the appeal is from the denial of motions to reconsider that were decided on entirely different grounds than those relied on by the district court at the time of its initial decision, the opportunity for an interlocutory appeal has not been forfeited. The new grounds upon which Judge McDonald decided the motion to reconsider raise significant legal questions that had not been considered by Judge McNichols. An interlocutory appeal from such an order is appropriate and permits us to consider the new grounds on which the district court relied
 
 
 [10]
 For the sake of clarity, references to the district court's partial summary judgment order should be understood to refer to both the January 21, 1994 order and the order deciding the parties' motions for reconsideration of that order. In the latter order, the district court simply amended two paragraphs of its partial summary judgment order to specify which defendants were liable to which plaintiffs, denied the "425" plaintiffs' motion for reconsideration of the grant of partial qualified immunity to Grabenstein and Reeve, denied the individual City defendants' motion for reconsideration of the liability judgments, and denied County defendant Grabenstein's motion to reconsider the partial denial of his claim of qualified immunity
 
 
 [11]
 The district court initially certified these orders for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), stating in the orders that they involved controlling questions of law "as to which there is substantial ground for difference of opinion" and that immediate appeal from them "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). However, a motions panel of this court denied the defendants' petition to appeal these orders immediately pursuant to § 1292(b). The order of the motions panel does not preclude this court from now considering those appeals to the extent that they are inextricably intertwined with the issues over which we have direct appellate jurisdiction
 
 
 [12]
 The plaintiffs contend that Grover Marks was wrongly identified on a police videotape and that he has never owned, operated, or served as an employee or agent of A & A Auto Sales
 
 
 [13]
 Two warrants were executed in this case, one for 428 S. Thor and one for 802 S. Thor. Except for the different addresses and the fact that the 802 S. Thor warrant specified James Marks as a person to be searched while the other mentioned no individual, the warrants were identical. We will, for the most part, refer to the two warrants with the singular "warrant."
 
 
 [14]
 James Marks' twelve year-old son, Michael Marks, was also in the car
 
 
 [15]
 The officers assert, however, that they declined the invitation to search, and instead waited for the arrival of the warrant
 
 
 [16]
 In their brief, plaintiffs do assert that appellants "began the warrantless search by forcibly barging into the homes at 428 S. Thor and 802 S. Thor." This assertion is supported with citations to the record preceded by the signal "[s]ee, for example." Unfortunately, none of the cited material refers to the search at 802 S. Thor, and, unaided, we have been unable to locate material in the voluminous record that would support plaintiffs' contention. Accordingly, we treat as undisputed, appellants' documented claim that James Marks initially invited them into his home and consented to a search of the premises
 
 
 [17]
 For example, Det. Neumiller states in his affidavit that Marks refused to open a safe discovered on the premises until the officers threatened to get a locksmith to open it forcibly. Marks then opened it quickly and slammed it shut. Neumiller then "order[ed]" Marks to open it again. Neumiller also states in his affidavit that after inspecting the warrant, Marks's attorney "told Mr. Marks that he should allow the search," suggesting that prior to that time Marks had, at least at some point, refused to do so. Accordingly, we conclude that the issue of consent to search the premises at 802 S. Thor is genuinely disputed by the parties
 
 
 [18]
 Several plaintiffs have stated in affidavits that the search began prior to the hour at which the warrant was issued by the magistrate. The plaintiffs also argue that testimony from state criminal and civil proceedings stemming from the search supports their contention. They point to testimony of the attorney called by Grover Marks during the search, several neighbors, and a postman. This third-party testimony makes it clear that the officers were present before the search warrant was authorized but does not answer the question whether the search was actually proceeding or whether the officers had simply secured the area. The plaintiffs also contend that the facts that the Spokane Fire Department received a call for assistance at 2:56 p.m. and that an ambulance arrived at 3:09, before the warrant was issued, along with officer testimony as to when during the search the ambulance was called, prove that the search began before the warrant was issued. The defendants counter that the ambulance was called to "stand-by" before the search began, according to normal police procedure
 
 
 [19]
 The appellants state that the officers did execute a "protective sweep" of the residences before the warrants arrived to ensure their safety
 
 
 [20]
 Allen left the police station sometime after the warrant was signed and went home
 
 
 [21]
 Appellants' attempt to characterize these searches as mere "pat-down[s]," is wholly unsupported by the record
 
 
 [22]
 The district court apparently concluded that defendant Weir, a police officer whose only role in the search was stopping a vehicle that left the residence before the warrant arrived, was not entitled to qualified immunity because there was a material dispute as to whether the traffic stop was pretextual and that defendant Harding, Assistant Chief of the Spokane City Police, was not entitled to immunity because of a material dispute as to his role in the search. With respect to Weir, as we discuss more fully below, we reverse the decision of the district court in light of the Supreme Court's recent decision in Whren v. United States, --- U.S. ----, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). With respect to Harding, under the Supreme Court's holding in Johnson v. Jones, --- U.S. ----, ----, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995), we are without jurisdiction to review a decision of the district court denying qualified immunity where that decision turns on the existence of a genuine issue of material fact
 
 
 [23]
 It is undisputed that all appellants except Harding and Weir participated in the search. We note that some of those who participated--appellants Allen and Freeman--did not physically engage in the search and were not present at the residences, some--those officers who only "secured" the premises--did not actually search persons, or even the homes, for evidence, and one, Lavelle, did not search or secure but rather videotaped the actions of others
 
 
 [24]
 Neumiller assisted Grabenstein and Reeve in preparing the warrant application but went to the 802 S. Thor residence before the warrant was authorized by the magistrate
 
 
 [25]
 While the district court did not explain how this rationale would support the denial of Allen's and Freeman's motions, that failure is irrelevant given the rationale we employ here
 
 
 [26]
 We need not consider whether qualified immunity might apply in the case of an officer who searched only the one individual specifically named in the warrant, only the two individuals as to whom permission to search was sought in the affidavit, or only those two individuals plus any others as to whom the affidavit established probable cause. No appellant asserts that his conduct was so limited
 
 
 [27]
 As noted above, supra at p. 1020, and as explained again below, infra at p. 1032, we also conclude that a genuine issue of material fact exists concerning whether, if the search of 802 S. Thor began before the arrival of the warrant, James Marks consented to a warrantless search
 
 
 [28]
 We also conclude that the disputed fact is material to the disposition of appellant Lavelle's qualified immunity motion, and accordingly we hold that summary judgment on that ground is inappropriate at this time for him as well
 
 
 [29]
 We express no view as to whether individual officers may have engaged in specific conduct during the course of the search of persons or the premises that would serve as additional reasons for depriving them of qualified immunity
 
 
 [30]
 We except Grub, who apparently ordered some of the plaintiffs to return to the house. See discussion infra p. 1033
 
 
 [31]
 In Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court made it clear that the objective reasonableness inquiry employed to determine an officer's entitlement to qualified immunity "is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to established probable cause and that he should not have applied for the warrant." Id. at 345, 106 S.Ct. at 1098. Malley clearly established that determining whether an officer seeking a search warrant is entitled to immunity is not limited to considering whether that officer sought advice from others, such as attorneys, before seeking the warrant or whether a magistrate ultimately authorized the warrant. Id. The officer applying for the warrant is required to minimize the danger of an unlawful arrest "by exercising reasonable professional judgment." Id. The objective reasonableness inquiry "is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." Id
 
 
 [32]
 The draft warrant was apparently signed by the magistrate without change
 
 
 [33]
 Those officers are also not entitled, as the district court found, to qualified immunity for their actions in searching the persons present on the premises, nor for instructing other officers to conduct searches of such persons
 
 
 [34]
 At one point in their brief, the plaintiffs appear to contest the fact that the lists were attached to the affidavit and warrant. However, the rest of their brief treats the issue as immaterial and refers to the attached lists as if they were in fact attached to the warrant
 
 
 [35]
 Again, we note that the district court found the issue of whether the officers began searching before the warrant arrive to be in dispute. It determined, however, that the issue was not material, because qualified immunity was being denied on another ground
 
 
 [36]
 With respect to the searches of both premises, we do not reach the question of the legality of the seizure of any particular items alleged to fall outside the scope of the warrant
 
 
 [37]
 A review of our cases suggests that we have assumed without deciding that videotaping of the execution of a valid search warrant is lawful. See United States v. Guzman, 75 F.3d 1090, 1092 (6th Cir.1996) (noting as part of background of case that the execution of a search warrant to search the contents of a bus passenger's bag was videotaped); United States v. Myers, 21 F.3d 826, 828 (8th Cir.1994) (noting as part of background of case that law enforcement officials made a videotape of the search of farm on which marijuana was growing, "showing the setup of the farm and the seizure of approximately 393 marijuana plants and a large amount of marijuana-growing equipment"), cert. denied, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995); United States v. Carpenter, 933 F.2d 748 (9th Cir.1991) (holding that the district court did not abuse its discretion in admitting into evidence videotape of the execution of a search warrant showing federal agents digging up the bodies of birds buried in pits); United States v. Willis, 759 F.2d 1486, 1501 (11th Cir.) (holding that district court did abuse its discretion in allowing the jury to view a silent videotape showing the police executing a search warrant for an airplane thought to contain cocaine), reh'g denied, 765 F.2d 154, cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985)