NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific* *Reporter.* *Readers are encouraged to bring typographical or other formal* *errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JARRETT J. OSBORNE,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-11929
Trial Court No. 4FA-13-375 CR

O P I N I O N

No. 2589 — March 2, 2018

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Elizabeth W. Fleming, Attorney at Law, Kodiak, under contract with the Office of Public Advocacy, for the Appellant. Eric A. Ringsmuth, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Craig W. Richards, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

Judge ALLARD, writing for the Court.
Senior Judge COATS, dissenting.

---

[*]  Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Jarrett J. Osborne was searched by police officers after he came to the door of a Fairbanks house owned by William Young. At the time Osborne arrived at the house, the police were executing a search warrant at the residence for evidence of methamphetamine sales. One of the provisions of this search warrant authorized the police to search "any person" who might arrive on the premises while the warrant was being executed.

Based in part on the search of Osborne's person, Osborne was charged with various drug and weapon offenses. Osborne later moved to suppress the evidence found on his person, asserting that the search warrant application for Young's residence failed to establish probable cause for the search-all-persons provision. In response, the State argued that the same probable cause showing that supported granting the police the authority to search Young's residence for evidence of drugs and drug sales also supported granting the police the authority to search any and all persons who might approach the residence during the execution of that search. The State also argued, in the alternative, that the police had sufficient independent reasons to detain, arrest, and search Osborne, even without the search-all-persons warrant provision, based on the suspicious circumstances of Osborne's middle-of-the-night arrival at Young's residence and the totality of the information about Young's drug dealing known to the police at the time.

The superior court agreed with the State that the search warrant application established probable cause for the "search any person" warrant provision. The court therefore upheld the search of Osborne's person on that basis, without reaching the State's alternative argument. Osborne was later convicted following a jury trial.

On appeal, Osborne argues that the superior court erred when it concluded that the search warrant application established probable cause to search any and all persons who might arrive on the premises during the execution of the search warrant.

To resolve Osborne's appeal, we must revisit an issue of law that we discussed, but did not have to fully resolve, in *Davis v. State*.[1] Specifically, we must decide what kind of proof the police must offer in a search warrant application to justify a warrant provision that allows the police to search any person who might arrive on the premises during the execution of the warrant.

For the reasons explained in this opinion, we conclude that such a broad grant of search authority is justified only if the search warrant application affirmatively establishes good reason to believe that any and all persons arriving at the premises during the execution of the warrant will probably be participants in the criminal activity being investigated and will probably be carrying evidence of that criminal activity on their person.[2]

Because the search warrant application in the present case failed to meet this standard, we conclude that the superior court erred in upholding the search of Osborne's person under the "search any person" warrant provision. We therefore remand this case to the superior court so that the court can consider the State's alternative argument for upholding the lawfulness of that search.

*Background facts and prior proceedings*

Around midnight on February 9, 2013, officers from the Fairbanks drug enforcement unit executed a warrant to enter the residence of William Young and arrest him for drug-related crimes.

---

[1]    *Davis v. State*, 938 P.2d 1076 (Alaska App. 1997).

[2]    *See Betts v. State*, 920 P.2d 763, 764 (Alaska App. 1996) (citing *State v. De Simone*, 288 A.2d 849, 850 (N.J. 1972)); *see also* 2 Wayne R. LaFave, *Search and Seizure* § 4.5(e), at 759-60 (5th ed. 2012); William E. Ringel, *Searches & Seizures, Arrests and Confessions*, § 5.17 (2d ed. Nov. 2017 Update).

During their protective sweep of the residence, the police observed numerous flat screen televisions, which were linked to surveillance cameras. The police also observed that the outside of the residence was equipped with motion detecting flood lights, and that all entryways to the residence were protected by barred security doors.

The police ultimately found Young hiding in a bedroom of his house. Young was searched incident to his arrest, and a large amount of cash was found in his pockets. In close proximity to Young, the police found a glass pipe containing drug residue; the residue field-tested positive for methamphetamine. The police also found Ziploc baggies in the bedroom closet.

Based on the discovery of these items, the police applied for a second warrant to search the premises (the house and the surrounding curtilage) for evidence of drug possession and drug sales.

Attached to the search warrant application were two boilerplate lists of items that the police wanted to search. The first attachment — "Attachment A Methamphetamine" — included nine different categories of things to be searched, most of which involved physical items such as money, business records, personal documents, etc., that might be found in the house. The second attachment — "Attachment B Electronic Devices, Digital Media" — included a list of the various electronic items that the police wanted to examine forensically.

Buried in Attachment A's boilerplate list of items to be searched was the following provision:

> Persons on the Premises to Be Searched: Any person on the premises at the time of service of the search warrant, for purposes of checking for the possession, sale or distribution of controlled substances and further for the purpose of identification.

The search warrant application did not include any direct reference to this provision. Nor did the search warrant application explain why this additional grant of search authority was being requested in this case, or why it might be justified.

The search warrant for the premises was granted around 3:00 a.m., and the police were authorized to conduct the search "immediately" (rather than waiting until 7:00 a.m.[3]). Once the warrant was issued, the team of law enforcement officers, who were already at Young's residence, served the warrant and began to search the residence.

A short time after the warrant had been served and the search had begun, Osborne knocked at the front door of Young's residence. A plainclothes officer answered the door, and Osborne asked if "Bill" was home. Osborne was detained, brought inside the residence and questioned, and ultimately searched. The search of Osborne's person revealed $8,390 in cash, 3.5 grams of methamphetamine, and a cell phone with text messages between Osborne and Young. Based on this evidence, the police obtained a search warrant to search Osborne's house. As a result of that search, the police seized drugs, money, and weapons. Osborne was later indicted for various criminal offenses, including misconduct involving a controlled substance, misconduct involving weapons, and conspiracy.[4]

Prior to trial, Osborne's attorney filed a motion to suppress the evidence found on Osborne's person and in his house, asserting that the initial search of Osborne's person was unlawful and that the later search of Osborne's house was fruits of that initial

---

[3] *See* Alaska Criminal Rule 37(a)(3)(C).

[4] *See* former AS.11.71.030(a)(1) (2013) (third-degree misconduct involving a controlled substance); AS 11.61.195(a)(1) (second-degree misconduct with weapons); AS 11.61.200-(a)(1) (third-degree misconduct involving weapons); former AS 11.71.030(a)(1) (2013) and AS 11.31.120 (conspiracy to commit third-degree misconduct involving a controlled substance).

unlawful search. The defense attorney argued, in particular, that the search of Osborne's person could not be justified under the "search any person" provision of the warrant because the search warrant application failed to establish that there was probable cause to grant the police such a broad grant of search authority.

In response, the State argued that the search warrant affidavit established probable cause to believe that illegal drugs were being sold out of the residence and that, by logical inference, there was probable cause to believe that any and all persons who came onto the premises while the police were executing the warrant would also be involved in drug sales or purchases. The State also argued, in the alternative, that the police had independent grounds to detain, arrest, and search Osborne, even if the "search any person" warrant provision was not valid.

Following an evidentiary hearing, the superior court denied Osborne's motion to suppress. Citing this Court's prior decision in *Davis*, the superior court ruled that the search warrant application established probable cause to search any and all persons who might arrive on the premises during the execution of the search. The court also ruled that the search of Osborne's person fell within the "search any person" warrant provision because Osborne arrived on the premises (*i.e.*, at the front door of the residence) while the search of the premises was still ongoing. The court did not address the State's alternative arguments for upholding the search.

Osborne was later convicted, following a jury trial, of misconduct involving a controlled substance, misconduct involving weapons, and conspiracy. This appeal followed.

*The foundation that the law requires before a judicial officer can grant the police the authority to search any and all persons arriving on a premises during the execution of a search warrant*

This Court first addressed the validity of a search-all-persons warrant provision more than twenty years ago in *Betts v. State*.[5] However, unlike the provision in the current case, the provision in *Betts* did not extend to "any person" who might arrive on the premises during the execution of the search. Instead, the provision in *Betts* was limited to individuals who were *already* present in the residence at the time the search warrant was served.[6]

The search warrant in *Betts* was issued based, in part, on a report from an eyewitness who had been in the residence approximately an hour before the warrant was obtained.[7] The eyewitness reported that she saw cocaine and marijuana in plain view, and that various individuals were "sitting around snorting powder off a dish."[8] The eyewitness also reported that one of the individuals tried to sell her drugs.[9] In addition, the search warrant application asserted that the owners of the residence were known drug dealers, that the residence had "lots of traffic coming and going," and that another vehicle had just approached the residence when the original call was made to the police.[10]

---

[5]  *Betts v. State*, 920 P.2d 763 (Alaska App. 1996).

[6]  *Id.* at 764.

[7]  *Id.* at 765-766.

[8]  *Id.* at 765.

[9]  *Id.*

[10]  *Id.*

The superior court ruled that the information in the search warrant application established "that the illegal activity at the residence was ongoing and overt," and that the police "were likely to find all persons in the residence participating in the sale and use of cocaine and marijuana."[11] The court also noted that granting the police the authority to search the individuals they found inside the residence would assist or facilitate the search of the residence itself, since it would prevent those individuals from trying to frustrate the search by hiding drugs on their persons.[12] We agreed with the superior court's analysis, and we appended the relevant portions of the superior court's ruling to our decision on appeal.

A year after we issued *Betts*, we issued our decision in *Davis v. State*.[13] *Davis* dealt with a warrant that authorized a search of a "crack house" — *i.e.*, a residence which (as we described in *Davis*) was "a commercial establishment devoted to the distribution of crack cocaine."[14] The search warrant in *Davis*, like the search warrant in the present case, authorized the police to search "any person on the premises at the time of service of the search warrant."[15] In *Davis*, we construed this language broadly, interpreting it to include not just the persons present when the warrant was *served*, but also any and all persons who might arrive on the premises during the ensuing *execution* of the warrant.

(In Osborne's case, the superior court adopted a similarly broad interpretation of the "search any person" provision of the warrant. Osborne does not

---

[11]  *Id.* at 767 (internal citations omitted).

[12]  *Id.* at 768.

[13]  *Davis v. State*, 938 P.2d 1076 (Alaska App. 1997).

[14]  *Id.* at 1078.

[15]  *Id.*

argue that the court should have construed the provision more narrowly, or that we should revisit this aspect of our decision in *Davis*.)

But in *Davis*, the defendants did not argue that the search warrant application failed to establish probable cause for the "search all persons" provision of the warrant. Instead, the defendants asserted that "search all persons" provisions were *per se* unconstitutional — that such provisions constituted "general warrants," and that they were therefore barred by the Fourth Amendment.[16] We rejected this argument in *Davis*,[17] and our decision of this point simply mirrors recognized Fourth Amendment law. As Professor LaFave notes in his treatise on the law of search and seizure, a warrant that authorizes the police to search all persons found within a specifically described place does not lack specificity "in the sense that the executing officer will be unable readily to determine to whom the warrant applies."[18]

The real question, Professor LaFave explains, is whether the search warrant application establishes probable cause for a search of this breadth — "whether the information supplied [to] the magistrate supports the conclusion that it is probable [that] anyone in the described place when the warrant is executed is involved in the criminal activity in such a way as to have evidence thereof on his person."[19] If the evidence in the

---

[16]   *Id.* at 1077.

[17]   *Id.* at 1077-78 (citing *Betts*, 920 P.2d at 764).

[18]   2 Wayne R. LaFave, *Search and Seizure* § 4.5(e), at 759-60 (5th ed. 2012) (footnotes omitted).

[19]   *Id.*

search warrant application supports such a conclusion, "then a search-all-persons-present provision is unobjectionable."[20]

Although the defendants in *Davis* did not directly argue that the search warrant application failed to support the "search all persons" provision of the warrant, we did note in *Davis* that there is a distinction between (1) the probable cause needed to support a search of all persons present when the police arrive to serve a warrant, as opposed to (2) the probable cause needed to support a search of any and all persons who might later arrive on the premises while the police are conducting the search.

We did not address this distinction further, because we found the distinction to be inconsequential under the facts of *Davis*:

> For some purposes, one might need to distinguish between the act of "serving" a search warrant (an act that occurs at a particular instant) and the act of "executing" the warrant (that is, the ensuing search of the premises, which might take hours). However, we do not believe that this distinction is useful for construing the scope of the search authorized by the warrant in this case.

> In the present case, the magistrate found probable cause to believe that the residence at 1550 Old Pioneer Way was being used as a "crack house" — a commercial establishment devoted to the distribution of crack cocaine. The magistrate also found that a person's [mere] presence at the house established probable cause to search them[, and the] appellants do not dispute this finding.

> [Because] the probable cause for the search of Davis's and Fox's persons depended on their voluntary presence at the site of an ongoing criminal enterprise[, we] do not see how this probable cause was diminished by the fact that

---

[20]   *Id.*

– 10 –                                                                                          2589

Davis and Fox arrived after the police, but while the police were still executing the warrant.[21]

Thus, in *Davis*, we did not have to address the different types of probable cause that are necessary to support these two different types of "search all persons" provisions.

In the present case, however, Osborne *does* challenge the sufficiency of the search warrant application to support a warrant provision that authorized the police to search any and all persons who might arrive at the premises while the police were conducting the search. We must therefore directly address the type of showing that the police must make to justify such a provision.

Because of the important Fourth Amendment rights at stake, other jurisdictions have established specific criteria for assessing the validity of such broad grants of search authority. We agree in general with the following formulation used by the courts of Iowa and New York:

> [The search warrant] application must set out the character of the premises, including its location, size, and public or private character; the nature of the illegal conduct at issue; the number and behavior of persons expected to be present when the warrant is to be executed; whether any persons unconnected with the alleged illegal activity have been seen on the premises; and the precise area and time in which the alleged activity is to take place. ... Taken as a whole, the facts presented to the judge must present a substantial probability that the authorized invasions of privacy will be justified by the discovery of the items sought from all persons present when the warrant is executed.[22]

---

[21] *Davis*, 938 P.2d at 1078.

[22] *State v. Thomas*, 540 N.W.2d 658, 664 (Iowa 1995) (citing *People v. Nieves*, 330

(continued...)

As various courts and commentators have noted, this type of focused inquiry serves the critical purpose of ensuring that the judicial officer issuing the warrant does not grant the police the authority to search all persons who may be present, or who may later arrive on the premises, without "carefully weigh[ing]" the risk that "an innocent person may be swept up in a dragnet and searched."[23]

This is not to say that a search-any-person warrant provision could never be supported by a less detailed showing. But when the police seek this type of broad search authority in their search warrant application, the application must, at a bare minimum, demonstrate some acknowledgment that they are asking the magistrate to authorize additional intrusions into the privacy rights of unknown persons. And the application must then provide sufficient information to allow the magistrate to determine whether there is probable cause to support such a broad grant of authority.

For instance, in William E. Ringel's *Searches & Seizures, Arrests and Confessions*, § 5.17 (2d ed. November 2017 Update), the applicable law is described as follows:

> The warrant must carefully describe the character of the premises and the nature of the illegal activity going on; also, the magistrate must be told how many people frequent the place, when they come and leave, and what they appear to be doing. Another important factor is whether anyone who seems to have no connection with the illegal conduct is ever seen there.

The search warrant application in the present case failed to meet these basic requirements. The application did not flag the "search any person" provision, nor did

---

[22] (...continued)
N.E.2d 26 (N.Y. 1975)).

[23] *Commonwealth v. Smith*, 348 N.E.2d 101, 107 (Mass. 1976).

the application explain why such a provision was being requested. (As we explained earlier, this provision was buried in a boilerplate list of items related to drug sales.)

Nor is Osborne's case like *Davis*, where the search warrant application established that the "residence" involved was actually a crack house — *i.e.*, a premises functioning *solely* as a commercial establishment for the illegal sale and consumption of drugs, thus providing reason to believe that anyone present was engaged in illegal activity.

Here, the premises was a stand-alone house in a residential neighborhood. Although the house was apparently owned by a drug dealer, the search warrant application contained no reports of other individuals coming onto the premises to engage in drug sales or drug consumption.[24] Nor was there any indication that the residence had previously been under police surveillance, or that there had been reports of suspicious traffic coming in and out of the residence.

The warrant application also did not address the possibility that innocent persons might come to the residence and be swept up in the "dragnet" of the "search all persons" warrant provision. Although the application noted that Young was alone in the house when he was arrested, the application provided no other information as to whether Young lived alone, and (if so) whether it was reasonably foreseeable that he would be visited by family members or friends who had no connection to his illegal activities.[25]

---

[24]  *See Betts*, 920 P.2d at 764-65.

[25]  *See Marks v. Clarke*, 102 F.3d 1012, 1029 (9th Cir. 1997) (noting that a "search all persons present" warrant might be appropriate for a structure that was dedicated exclusively to criminal activity — "for example, a building or apartment used as a crack house, a barn used as a methamphetamine lab, or a warehouse used exclusively as a storage place for [illegal] arms" — but that such a provision would not be appropriate "with respect to a raid on any family home where innocent family members or friends might be residing or

The warrant application also did not provide any estimate of how long the search of the residence was expected to take, nor did it indicate whether the search would be in progress during normal daytime hours, when innocent visitors such as mail carriers or delivery persons might reasonably be expected to arrive.[26] Nor did the application make any effort to limit the scope of the "search all persons" warrant provision so that it would exclude such innocent visitors.[27]

In his dissent, Senior Judge Coats ignores these deficiencies in the search warrant application. Rather than requiring the police to affirmatively justify this type of broad search authority when they apply for a warrant, Judge Coats argues that "common sense" supports the "search all persons" provision of the warrant.

We agree that search warrant applications should be read in a "common sense and realistic" manner, and that marginal cases should be resolved in favor of upholding the warrant.[28] But this does not mean that reviewing courts should ignore obvious deficiencies in a search warrant application. Nor does it mean that appellate courts are allowed to uphold search warrants by speculating about the potential

---

[25] (...continued)
visiting").

[26] *See, e.g.*, *State v. Reid*, 872 P.2d 416, 419 (Or. 1994) (noting that persons reasonably expected to be approaching the front door of a private residence for innocent purposes include mail carriers, package delivery persons, volunteers soliciting donations for charitable purposes, and neighbors seeking to borrow sugar).

[27] *See, e.g.*, *State v. Allard*, 674 A.2d 921, 922-23 (Me. 1996) (upholding a search "all persons" warrant provision where the magistrate judge made a specific exception for "people who may arrive upon or be upon said premises in a regular course of business, (i.e. postman, delivery people)").

[28] *Rosa v. State*, 633 P.2d 1027, 1030 (Alaska App. 1981); *see also State v. Koen*, 152 P.3d 1148, 1151 (Alaska 2007).

significance of information that was never directly provided to the judicial officer issuing the warrant.

Here, a "common sense and realistic" reading of the search warrant application suggests one of two possibilities: either the officer who applied for the warrant forgot that Attachment A's boilerplate list of "items" to be searched included a "search all persons" warrant provision, or (alternatively) the officer erroneously believed that such a provision was routine in all drug cases — and that if there was probable cause to search the house, then there was automatically probable cause to search any and all persons who might come to the house while the police were there.

Judge Coats's dissent ignores the indirect manner in which the police requested the "search all persons" provision. Instead, the dissent focuses on "facts" that were not part of the search warrant application.

For example, the dissent asserts that the police had "reliable information that Young was a high-end methamphetamine dealer who dealt in large quantities of the drug." But this information was presented at a later evidentiary hearing; it was not included in the search warrant application itself.

The dissent also characterizes Young's residence as "basically a fort where William Young stored drugs and valuable property that he did not want to put at risk." From this characterization, the dissent concludes that Young would treat "anyone approaching the house as a threat," and that therefore Young had probably discontinued all delivery of mail and packages to his house — thereby making it less likely that an innocent person would approach the house and be searched for no reason.

But there is nothing in the search warrant application to support the dissent's assumption that Young had discontinued mail service and commercial delivery to his residence. That is complete speculation.

The record also does not support the dissent's characterization of Young's residence as a "fort" that no ordinary person would visit or even approach.

It is true that the search warrant application describes Young's elaborate security system. But the application does not indicate the extent to which this extensive security system would be obvious to a person approaching the house. We note that the warrant application describes Young's residence as simply "a two-story wood frame structure with a loft." And a photograph of this residence introduced at the evidentiary hearing suggests that there was nothing remarkable about the outward appearance of the house. In fact, the photograph shows a holiday decoration by the front door.

The dissent also focuses on the suspicious nature of Osborne's middle-of-the-night arrival at Young's house. We agree that the circumstances of Osborne's arrival at the residence were suspicious. But the issue presented in this appeal is not whether the police had reason to stop and search Osborne based on the particularized circumstances of his arrival and the totality of the information known to the officers at the time. That was the State's *alternative* argument to uphold the search — the alternative argument that the superior court never reached.

Rather, the question before us in this appeal is whether there was probable cause to support a warrant provision authorizing the police to search *any and all persons* who arrived at the house while the police were conducting their search. For purposes of answering this question, the particular circumstances of Osborne's arrival at the house are immaterial. Instead, the only material information — the only information we can lawfully consider — is the information contained in the search warrant application itself.

Lastly, the dissent suggests that our concerns about the "search all persons" provision of the warrant are overstated. The dissent minimizes the constitutional dangers of such warrants by asserting that we can trust the police to do the right thing. The dissent declares that we can simply assume that the "it seems unlikely that the police

would search a mail carrier or a Girl Scout," and that we should "credit the police with having enough sense to not search someone who knocked on the door unless there were suspicious circumstances."

We reject these arguments because they are fundamentally inconsistent with the principles behind the Fourth Amendment's warrant requirement.

As a general matter, the police do not need a warrant to conduct a felony arrest and to search the arrestee for evidence of the crime.[29]  If the court had determined that the police had probable cause to arrest Osborne for such an offense, this appeal would not be in front of us.

This appeal is before us because the court upheld the search based on the "search all persons" provision of the warrant — a provision that ostensibly gave the police the authority to search any and all persons who might arrive at the house while they were conducting their search, even in the absence of affirmative individualized suspicion.

Under our state and federal constitutions, we do not give police officers free-ranging authority to conduct such searches.[30]  Instead, this type of broad search authority can only be approved in advance by a judicial officer through the warrant process.  Moreover, the judicial officer must not grant such blanket search authority unless the search warrant application establishes that there is probable cause to believe that any and all persons arriving on the premises during the specified period of time will

---

[29]  *See* 2 Wayne R. LaFave, *Search and Seizure* § 4.9(c), at 896-97 (5th ed. 2012).

[30]  U.S. Const. amend. IV, XIV; Alaska Const. art. 1, § 14.

probably be participants in the criminal activity being investigated and will probably be carrying evidence of that criminal activity on their persons.[31]

Because we conclude that there was insufficient information in the search warrant application in this case to justify such a conclusion, we reverse the superior court's ruling on Osborne's suppression motion.

However, this reversal does not resolve this case. As we previously explained, the State argued in the alternative that the police had independent, lawful reasons to detain and search Osborne, based on the particularized suspicious circumstances of Osborne's arrival at Young's residence and the totality of the information known to the police at the time of the search. The superior court did not address this alternative argument. Accordingly, we remand this case to the superior court so that the court can consider and rule on the State's alternative arguments for upholding the lawfulness of the search. We express no opinion on the merits of the State's alternative argument.

*Conclusion*

The decision of the superior court is REVERSED, and this case is remanded to the superior court for further proceedings consistent with this opinion.

---

[31] *Betts*, 920 P.2d at 764; 2 Wayne R. LaFave, *Search and Seizure* § 4.5(e), at 759-60 (5th ed. 2012).

Senior Judge COATS, dissenting.

This case begins with the police obtaining a warrant to search the Northwood Drive residence for William Young. The police had reliable information that Young was a high-end methamphetamine dealer who dealt in large quantities of the drug and that he was present at the Northwood Drive residence.[1]

The police served the warrant just after midnight on February 9, 2013. The police found Young hiding in the residence. No one else was present.[2] The police searched Young incident to the arrest. They found a large amount of cash in his pocket. And they found a pipe which was located near Young which field-tested positive for methamphetamine.

In a protective sweep of the house, the police discovered "numerous flat screen televisions and items of value. Linked to the flat screen televisions were numerous surveillance cameras." Every exterior door to the house was a barred security door. The exterior of the house was "surrounded by motion detecting flood lights."

---

[1]  The warrant for the arrest of William Young was issued by the Fairbanks district court a short time before his arrest and almost certainly included this information. But even without this earlier warrant, we can infer that, since this earlier warrant authorized the police to break into his residence at midnight, Young was a significant drug dealer. To the extent there was any doubt about this, the amount of security at the residence and the valuable property stored within the residence supported the inference that Young was a major drug dealer and that this residence was a secured warehouse for a major drug operation.

[2]  It is reasonable to infer that no one besides Young was in the residence when the police entered and arrested him just after midnight. If someone had been present in the residence, it would have been an important omission for the police to not reveal this to the magistrate when they were obtaining the second warrant to search the residence. Given the level of security at the residence and the large amount of valuable property stored in the residence, it was reasonable to infer that anyone else "on the premises" would be connected to the drug operation.

– 19 –                                         2589

In the application for the warrant, the police indicated that individuals who deal with drugs usually have large quantities of cash and unreported income. Consequently drug dealers go to great lengths, such as the police observed in the Northwood Drive residence, to protect their illegal business. The many valuable items which the police observed were also consistent with the illegal business.

It appears to me that the information presented to the issuing judge established that the Northwood residence was the location of a major drug selling operation.

The issuing judge issued the warrant at 3:11 a.m. and allowed the search to take place "immediately." The magistrate authorized the police to search "[a]ny person on the premises at the time of service of the search warrant, for purposes of checking for the possession, sale or distribution of controlled substances and further for the purposes of identification."[3]

During the search, at approximately 3:30 a.m., Osborne arrived at the Northwood Drive residence, knocked on the door, and explained that he was looking for "Bill." It appears to me that Osborne was clearly covered by the warrant under the circumstances and that the police were authorized to search Osborne under the warrant.

---

[3] The opinion of the court suggests that the police should have focused more on the possibility that a confederate might show up during the search. But that possibility was not the focus of the warrant. So it is understandable that the police would not go into great detail when they were requesting authority to search "all persons on the premises." I believe under the rule of law that requires us to interpret warrants generously, we should assume that the police knew what they were asking for when they put this request in the warrant. Similarly, we are to assume that the district court judge knew what was in the warrant when he issued it. With the benefit of hindsight, briefing, and time, an appellate court can easily think of how a warrant could have been better drafted. But the law requires us to give "great deference" to a magistrate's decision to issue a warrant.

As I understand the opinion of the Court, the Court is concerned that the warrant might be overbroad — that the warrant would authorize the police to search completely innocent people who had no connection with the drug operation. But I think that this concern is limited in this case. First, when the police arrested Young, it was just after midnight and no one was present in the house. The police would have secured the house while they were obtaining the warrant. And, from the police observations, it appears that anyone who had spent any time in the house would recognize that this was not an ordinary residence. Between the extraordinary surveillance and the numerous valuable items of property that were present in the house it would have been apparent that this house was the scene of illegal activity.

But this residence did not appear to be the usual retail drug-selling operation which is described in the cases the Court relied upon.[4] In those kinds of cases, a regular stream of retail customers is going into the house at all hours of the day and night to obtain drugs. And that is the kind of evidence that the police present to magistrates to obtain a search warrant for that kind of a retail drug operation. If the police get a warrant, then they go into the residence. And it would be reasonable to expect that the stream of people attempting to buy drugs would continue if the police did nothing to announce their presence within the residence.

But the case before us is an entirely different kind of case. In this case the residence was basically a fort where William Young stored drugs and valuable property that he did not want to put at risk. Unlike the cases cited in the Court's opinion, in this case the police had already been inside the residence — to arrest Young — before applying for the second warrant. The evidence the police found supported the inference

---

   4   *See, e.g.*, *Commonwealth v. Smith*, 348 N.E.2d 101, 107 (Mass. 1976), *cert. denied*, 429 U.S. 944 (1976).

that Young was protecting his property, and would not want anyone to approach this residence. Anyone approaching the residence and knocking on the door would be someone involved in the wholesale operation or perhaps obtaining drugs to sell as part of a retail operation, rather than a retail customer.

To protect his drug operation, Young would have realized that anyone approaching the house might see something suspicious and thus, he would have to treat anyone approaching the house as a threat. He would probably not have had residential mail or package delivery for that reason. Therefore it does not appear that there was any reasonable risk of arresting family members who were not involved in the drug trade or other innocent bystanders. In particular, it seems unlikely that a mail carrier, a UPS driver, or any other innocent person would be approaching the house, much less knocking on the door. The fact that the search was initiated a little after 3:00 a.m. would also limit the risk of an innocent bystander being searched. It therefore seems unlikely that anyone not involved in the drug operation would be approaching this house.

In addition, in the unlikely event that someone did approach the house and knock on the door, I think we can credit the police with having enough sense to not search someone who knocked on the door unless there were suspicious circumstances. Finally, it seems unlikely that the police would search a mail carrier or a Girl Scout. On the other hand, someone knocking at the door at 3:30 a.m. and asking for the drug dealer the police had just arrested would be "on the premises" and covered by the warrant. *Davis v. State*, 938 P.2d 1076, 1078-79 (Alaska App. 1997) (people knocking on the door of a drug house which is being searched by the police are considered to be "on the premises" for purposes of the search warrant).

In *State v. Koen*, 152 P.3d 1148, 1151 (Alaska 2007), the Alaska Supreme Court directed courts reviewing the issuance of a search warrant to give "great deference" to a magistrate's decision to issue a search warrant:

[In determining whether there is probable cause for a magistrate's decision to issue a search warrant] we begin by recognizing that magistrates have broad latitude to draw reasonable inferences from the evidence placed before them. Accordingly, we give "great deference" to the magistrate's discretion and resolve marginal cases in keeping with the traditional preference accorded to warrants. (Citations omitted.)

The supreme court recognized that warrants are issued under emergency circumstances and that the police and magistrates operate under different circumstances than an appellate court does. The court recognized that a reviewing court should encourage the use of warrants and police should be able to rely on them. Under the facts of this case, I see little risk of abuse based on the circumstances set out in this warrant. I accordingly dissent.